# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MITCHELL BEHM, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC., a New Jersey corporation, d/b/a AUDI OF AMERICA, INC., AUDI AG, a German corporation, and VOLKSWAGEN AG, a German corporation,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

1.     Plaintiff Mitchell Behm ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Volkswagen Group of America, Inc., ("VWGoA") d/b/a Audi of America, Inc., Audi AG, and Volkswagen AG ("VWAG") (collectively "VW" or "Defendants"). Plaintiff alleges the following based on personal knowledge as to their own acts and experiences, and based upon the investigation conducted by their counsel, including review of repair records, warranty materials, service communications, publicly available consumer complaints, technical service materials, and other publicly available information, as to all other allegations:

## INTRODUCTION

2.      Plaintiff brings this consumer class action against Volkswagen Group of America, Inc., ("VWGoA") d/b/a Audi of America, Inc., Audi AG, and Volkswagen AG ("VWAG") (collectively "VW" or "Defendants"). Defendants manufactured, marketed, distributed, warranted, and sold 2009–2017 Audi Q5 and SQ5 vehicles (the "Class Vehicles") equipped with a defective subframe system. The system is defective because plastic coverings on the subframes of Audi Q5s and SQ5s trap moisture and other elements, causing the subframe to rust, rot, and corrode undetected, which creates a dangerous safety hazard, the existence and extent of which is concealed by the plastic coverings. This results in a myriad of negative consequences for the Class Vehicles and their safe and reliable operation. Plaintiff refers to this common defect as the "Subframe Defect" or the "Defect."

3.      Defendants VWAG, Audi AG, or both, designed and manufactured the Class Vehicles, and Defendant VWGoA imported, distributed, marketed, and sold the Class Vehicles through its extensive network of authorized dealerships in the United States. Defendant VWGoA also provides service and maintenance for the Class Vehicle at dealers and service providers nationwide, using information provided by VWAG, Audi AG, or both.

4.      Defendants sold, directly or indirectly, through their agent dealers and other retail outlets, the Class Vehicles throughout the United States, without disclosing that the Class Vehicles' subframes were equipped with plastic coverings that trapped moisture and other elements, causing the subframe to rust and corrode.

5.      VW failed to disclose the Subframe Defect to purchasers and lessees of the Class Vehicles before sale or lease, including in VW's marketing materials, vehicle descriptions, warranty materials, owner-facing disclosures, authorized-dealer communications, and other materials reasonably expected to convey known safety- and reliability-related defects. The omitted information was material because the Defect can cause moisture and other debris to be trapped in between the subframe and plastic coverings, causing the subframe to rot, rust, and corrode, which can result in perforation of the subframe that renders the vehicles unsafe to drive without expensive repairs and subframe replacement.

6.      VW provided the Class Vehicles, when sold new, with a 4-year/50,000-mile New Vehicle Limited Warranty ("NVLW") that covered defects in materials or workmanship and a 12-year (no mileage limitation) Limited Warranty against Corrosion Perforation Warranty ("Corrosion Perforation Warranty") that covered repair or replacement due to a defect that resulted in rust perforation of the vehicle body, both of which, with limited exception, began on the date of original purchase or lease and transferred, without cost, if ownership of the vehicle changed within the applicable warranty period. Certain Class Vehicles also were sold or transferred with remaining New Vehicle Limited Warranty and Corrosion Perforation Warranty coverage, certified pre-owned warranty coverage, parts-and-accessories warranty coverage, or other VW-administered warranty or goodwill coverage. Despite this warranty framework, VW and its authorized dealerships often refused to provide warranty coverage for the Defect, requiring Class Vehicle owners and lessees instead to pay out of pocket for repairs and replacement of corroded subframes.

7.      The Subframe Defect is inherent in the Class Vehicles and was present at the time of sale or lease. Although the Defect may not manifest immediately, the problematic subframe coverings are built into the Class Vehicles when they are manufactured. As a result, the Class Vehicles are predisposed from the time of sale or lease to premature rust and corrosion of the vehicle subframe and related failures during ordinary operation.

8.      As discovery will show, by the beginning of 2009, VW knew the Class Vehicles' subframe components were prone to rot, rust, and corrode t and would require repair or replacement. Nevertheless, VW continued to manufacture, distribute, warrant, market, and sell the Class Vehicles without disclosing the Defect to consumers.

9.      VW did not disclose the Defect to purchasers and lessees in owner-facing materials. However, VW communicated internally and with its dealers about recurring subframe corrosion conditions through sharing internal data, warranty processes, dealer repair procedures, technical assistance, Technical Service Bulletins, Special Service Messages, manufacturer communications, and other dealer-facing channels that were not provided to ordinary purchasers or lessees before sale or lease. These dealer-facing communications and repair procedures allowed VW and its authorized dealerships to diagnose manifestations of the defect—such as rotting, rusting, and corroding subframes—and to perform stopgap repairs to address the customers' immediate symptoms and complaints, without disclosing to consumers that these failures reflected a broader defect in the Class Vehicles' subframe system.

10.    VW had superior and exclusive knowledge of material facts regarding the Defect through sources unavailable to ordinary consumers, including pre-release testing, durability testing, thermal and pressure-cycle testing, design failure mode and effects analysis, warranty claims, goodwill claims, replacement-part sales data, dealer repair orders, dealer technical-assistance requests, dealer audits, aggregate repair data, customer complaints made directly to VW and its authorized dealerships, consumer complaints submitted to NHTSA, online owner complaints, and VW's own development of technical service materials addressing subframe corrosion. VW's authorized dealerships were part of this knowledge chain because they diagnosed Class Vehicles, submitted warranty and goodwill claims to VW, performed repairs using VW procedures and parts, and communicated with VW concerning subframe rot, rust, and corrosion.

11.    The Defect is material, *inter alia,* because it strikes within the warranty period and affects safety, reliability, repair cost, and the ordinary use of the Class Vehicles. Rust and corrosion that has perforated the subframe can cause the subframe to break while the vehicle is being driven and create unsafe driving conditions. The Defect also imposes substantial economic harm because owners and lessees must present their vehicles for diagnosis and repair, pay for replacement subframes and related components, lose use of their vehicles, and continue driving vehicles that may experience recurring subframe rust and corrosion even after prior repairs.

12.    VW's failure to disclose the Defect has caused Plaintiff and Class Members to overpay for the Class Vehicles, lose the use of their vehicles, incur

diagnostic and repair costs, pay for repairs and replacements of subframes, plastic subframe coverings, and related components, and continue driving vehicles that are prone to recurring subframe rust and corrosion. Rather than disclose the Defect to consumers, VW addressed subframe rust and corrosion complaints through stopgap, piecemeal diagnosis and repair procedures. As a result, owners and lessees have been required to pay for repeated replacement of subframes and related components, while VW retained the benefit of selling, leasing, warranting, servicing, and supplying replacement parts for vehicles it knew suffered from the Defect.

13. Had VW disclosed the Defect before sale or lease, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, would have paid less for them, would have purchased or leased different vehicles, and/or would have required VW to repair the defective subframe, plastic subframe coverings, and related components with non-defective parts before purchase, lease, or expiration of applicable warranty coverage. The omitted information was material because reasonable consumers do not expect luxury vehicles to be defective in that the subframe rots, rusts, and corrodes, causing extensive subframe damage, loss of use, expensive repairs, and unsafe driving conditions.

## JURISDICTION AND VENUE

14. This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiff and many members of the Class are citizens of states different from Defendants, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class and Classes.

15.    This Court has personal jurisdiction over Plaintiff because Plaintiff submits to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because VWGOA conducts substantial business in this District; and significant conduct involving Defendants giving rise to the Complaint took place in this District.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and VWGoA regularly conducts business in this District.

## THE PARTIES

**Plaintiff Mitchell Behm**

17.    Plaintiff Mitchell Behm is a Maryland citizen who resides in Potomac, Maryland.

18.    On or around April 2018, Plaintiff Behm purchased a 2015 Audi Q5 from Alexandria Volkswagen, located in Alexandria, Virginia.

19.    Plaintiff Behm purchased his vehicle primarily for personal, family, or household use.

20.    Safety and reliability were important factors in Plaintiff Behm's decision to purchase his vehicle. Before purchasing, Plaintiff Behm reviewed the vehicle's CARFAX report and purchase agreement and discussed the vehicle with a representative of Alexandria Vokswagen. Plaintiff Behm reasonably expected that an Audi vehicle sold by a reputable Volkswagen dealership would be safe, reliable, durable, suitable for ordinary use, and free from undisclosed defects. When Plaintiff Behm purchased his vehicle, he was unaware that it contained the Subframe Defect.

7

21.     It was not disclosed to Plaintiff Behm, before or at the time of purchase, that his vehicle contained a dangerous defect that accelerates rust and corrosion of the car's subframe. This was material to Plaintiff Behm. Had Audi disclosed the Defect before Plaintiff Behm purchased his vehicle, including through Audi-controlled materials, authorized-dealer disclosures, warranty materials, owner-facing communications, or disclosures provided to Alexandria Vokswagen, Plaintiff Behm would have seen and been aware of the disclosure. Had he known of the Defect, Plaintiff Behm would not have purchased his vehicle, would have paid less for it, or would have required that the defective components be replaced with non-defective components before purchase.

22.     In or around August 2023, Plaintiff Behm brought his 2015 Audi Q5 into the shop for routine maintenance. At the time, his mechanic had a practice of removing the plastic coverings on Audi subframes after having repeatedly seen accelerated rust and corrosion in the vehicles. Upon doing so with Mr. Behm's vehicle, the mechanic alerted Mr. Behm that his Audi Q5 likewise revealed hidden and extensive rust and corrosion under its plastic subframe coverings. Mr. Behm's mechanic further advised Mr. Behm that his vehicle was unsafe to drive. As can be




seen in the below photographs, the extensive rust, holes, and cracks in the metal subframe—constituting a hidden and dangerous safety hazard—were only revealed once the plastic coverings of the subframe were removed by Mr. Behm's mechanic.

23. Upon first learning of this dangerous Defect causing premature and extensive corrosion of his Audi Q5 subframe, Mr. Behm reached out to his local Audi dealership, Audi of Rockville, to ask if they would cover the cost of the repair, but Audi Rockville refused, claiming that the vehicle was no longer under warranty.

24. Mr. Behm thus ultimately paid thousands of dollars out of pocket to repair the subframe in order for the vehicle to be safe to drive again.

25. He then reached out to Audi of America to request reimbursement for the cost of his subframe repair, but Audi of America likewise refused to reimburse him for the repair. In or about September 2023, instead of claiming that Mr. Behm's vehicle was no longer under warranty, Audi claimed this time that the issue was that "the repair was performed by a non-Audi dealer, and the vehicle was not diagnosed by a certified Audi dealer to determine if the concern met the parameters of the warranty in question," notwithstanding the fact that the Audi dealership, in fact, informed Mr. Behm that it would not cover the repair.

26. Thereafter, in or about October 2025, Mr. Behm reached out to Audi Rockville in writing, to request reimbursement of his prior repairs. The dealership, however, refused.

27. Prior to the purchase of his vehicle, Plaintiff Behm did not know about the Defect. Defendants had exclusive knowledge of the Defect and actively concealed it. The Defect was material to Plaintiff Behm. Had Defendants disclosed

9

the Defect, Plaintiff Behm would have been aware and would not have purchased his vehicle or would have paid less for it.

28.    As a result of the Defect, Plaintiff Behm lost the benefit of his bargain, overpaid for his vehicle, paid for repeated repairs, lost use of his vehicle, and lost confidence in the ability of his vehicle to provide safe and reliable transportation. Further, Plaintiff Behm will be unable to rely on Audi's advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so if he could rely on Audi's representations about the vehicles.

29.    At all times, Plaintiff Behm, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendants**

30.    Defendant VWGoA is an entity incorporated in New Jersey with its principal place of business and headquarters at 220 Ferdinand Porsche Drive, Herndon, Virginia 20171. At this facility, VWGoA coordinates the United States operations and activities of the Volkswagen, Audi, Bentley, Bugatti, and Lamborghini brands, as well as the activities of its 8,000 employees and its subsidiary, VW Credit, Inc. One of VWGoA's fictious names is Audi of America, Inc., which it has registered with the Virginia Secretary of State.

31.    Defendant VWGoA, through its various entities, markets, distributes, warranties, and sells Audi-branded automobiles and parts for those automobiles, including the Class Vehicles, in multiple locations across the United States, including Maryland and Virginia.

10

32.    In order to sell vehicles to the general public, VW enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiff. In return for the exclusive right to sell new Audi-branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties VW provides directly to consumers who purchased vehicles from the authorized dealerships. All service and repair at an authorized dealership are completed according to VW instructions, issued through service manuals, TSBs, technical tips ("TT"), and other documents. Per the agreements between VW and the authorized dealers, consumers such as Plaintiff are able to receive services under VW's issued warranty at dealer locations that are convenient to them, making Plaintiff and consumers the third-party beneficiary of these contracts. These agreements provide VW with a significant amount of control over the actions of the authorized dealerships, of which there are more than 1,000 in the United States.

33.    VWGoA, in conjunction with VWAG and Audi AG, drafted the warranties it provides directly to consumers such as Plaintiff. These warranties are provided on a take-it-or-leave it basis. VwGoA designates its authorized dealerships as its agents to perform warranty repairs.

34.    VWGoA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. VWGoA is also responsible for the content of the Monroney Stickers on Audi-branded vehicles, the information for which comes from the manufacturer. VWGoA also fulfills the role of reporting, recall, and other duties under federal motor vehicle safety laws and in interfacing with NHTSA.

35.    Defendant VWGoA manufactured, marketed, sold and warranted the Class Vehicles, including Plaintiff's vehicle.

36.    Defendant Volkswagen AG is an entity incorporated in and registered to do business in Germany with its principal place of business at Berliner Ring 2, 38440, Wolfsburg, Germany. This facility also encompasses a 70 million sq. ft. manufacturing facility, the Wolfsburg Volkswagen Plant, where over 800,000 vehicles are produced each year. The Wolfsburg headquarters also have individual production facilities, specialty production plants, warehouses, and administration buildings, with over 20,000 employees. VWAG designs, engineers, manufactures, tests, markets, supplies, sells and distributes Volkswagen, Skoda, and Audi-branded vehicles and parts for those vehicles worldwide, including the in the United States.

37.    VWAG is the parent corporation of VWGoA and Audi AG, which are each wholly owned subsidiaries. VWAG is also the parent corporation of the United States manufacturing facilities for Volkswagen and Audi-branded vehicles. For all its United States subsidiaries, including VWGoA, VWAG and/or Audi AG provide all the technical information for the purpose of manufacturing, servicing, and repairing the Class Vehicles. VWAG selected New Jersey for the original site of VWGoA's headquarters and chose to have VWGoA incorporated as a New Jersey entity. Each year since 2016, VWAG has reported over 35 billion euros (or over 41 billion in U.S. dollars) of revenue from its North American activities via VWGoA and its network of authorized dealerships.

38.    Defendant Audi AG is an entity incorporated and registered in Germany with its principal place of business at Auto-Union-Str. 2 D-85045,

Ingolstadt, Germany. The Ingolstadt facility encompasses both corporate offices, which coordinate and supervise its worldwide operations, and a factory totaling over 30 million sq. ft., which produces over 300,000 vehicles a year. As of the end of 2020, over 43,000 employees worked at this facility. Audi AG designs, engineers, manufactures, tests, markets, supplies, sells and distributes Audi-branded vehicles and parts for those vehicles worldwide, including in the United States.

39.   The relationship between VWAG and VWGoA is governed by a General Distributor Agreement that gives Audi AG and/or VWAG the right to control nearly every aspect of VWGoA's operations related to both Volkswagen and Audi-branded vehicles—including sales, marketing, management policies, information governance polices, pricing, and warranty terms.

40.   For all VWAG United States subsidiaries, including VWGoA, VWAG and/or Audi AG provides all the technical and information for the purpose of servicing and repairing the Class Vehicles, as well as the information needed to draft the owners' manuals.

41.   At all relevant times, VW was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components in New Jersey and throughout the United States of America.

### FACTUAL ALLEGATIONS

42.   Defendants designed, manufactured, distributed, marketed, sold, and/or leased the Class Vehicles. Defendants sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles throughout the United States.

13

Defendants warrant and service the Class Vehicles through their nationwide network of authorized dealers and service providers.

43.    VWGoA distributes Audi vehicles through a nationwide network of authorized dealerships, including the authorized dealerships from which Plaintiff purchased, serviced, or attempted to repair their Class Vehicles. These authorized dealerships sell Audi vehicles to consumers, communicate VWGoA's vehicle and warranty information to consumers, perform warranty and goodwill repairs, submit warranty and goodwill claims to VWGoA, order replacement parts through VWGoA -controlled channels, and diagnose and repair vehicles using VWGoA's service procedures, service manuals, technical service bulletins, special service messages, technical tips, diagnostic procedures, and other dealer-facing communications.

44.    VWGoA, under its business name of Audi of America, Inc., drafted, issued, administered, and controlled the New Vehicle Limited Warranty, the 12-year Corrosion Perforation Warranty, and other warranty materials provided in connection with the Class Vehicles. Under VWGoA's warranty framework, authorized dealerships perform warranty repairs on VWGoA's behalf, but VWGoA controls the warranty terms, repair procedures, covered components, parts authorization, reimbursement, claim submission process, and ultimate warranty-coverage determinations that the dealerships make. VWGoA therefore receives and maintains information from authorized dealerships concerning recurring customer complaints, diagnoses, repair attempts, replacement parts, warranty claims, goodwill requests, and component failures in the Class Vehicles.

45.     The New Vehicle Limited Warranty ("NVLW") provided by VWGoA covers "defects in manufacturer's material and workmanship," and is limited to "4 years or 50,000 miles from your vehicle's in-service date, whichever occurs first." This coverage includes the vehicle's control modules as well as the workmanship in assembling the vehicle.

46.     Despite the fact that the New Vehicle Limited Warranty is provided by VWGoA, the copyright to the warranty terms is held by Audi AG. As such, the warranty booklets provided to Plaintiff and consumers by VWGoA are done so with the explicit permission and direction of Audi AG. Moreover, Audi AG is the author of the warranty terms.

47.     VWGoA also provides "Audi Certified pre-owned Limited Warranty" to vehicles purchased as "certified pre-owned" from authorized Audi dealerships. This Certified Pre-Owned Warranty provides that "[i]f Audi New Vehicles Limited Warranty (NVLW) coverage remains at the time of Certified pre-owned (CPO) purchases, CPO Limited Warranty Coverage commences upon expiration of NVLW and continues until 5 years from vehicle's original in-service date with no mileage limitation. If NVLW coverage has expired at time of CPO purchase, CPO Limited Warranty coverage continues for 12 months with no mileage limitation."

48.     The coverage terms of the CPO Limited Warranty are similar to the terms of the New Vehicle Limited Warranty.

49.     In addition, for Audi branded vehicles, VWGoA provides a 12-year Corrosion Perforation Warranty that covers rust perforation of the vehicle body.

15

50.    Unlike many car companies, VW does not make its owners' manuals and warranty booklets available online prior to purchase. In order to access such materials on VW's websites, a consumer needs a Vehicle Identification Number. As such, the full warranty terms are presented to Plaintiff and consumers after the purchase, on a take-it-or-leave-it basis.

51.    VWGoA also provided or controlled information appearing on window stickers/Monroney labels for Audi vehicles sold in the United States, including information supplied by or on behalf of the manufacturer parent defendant companies, VWAG and Audi AG.

52.    VWGoA was responsible for monitoring and responding to safety- and defect-related information concerning Audi vehicles in the United States, including consumer complaints, dealer repair data, warranty claims, technical service information, replacement-part demand, and communications with the National Highway Traffic Safety Administration ("NHTSA"). Defendants together issued and disseminated dealer-facing technical service materials concerning leaks in subframe coverings, corrosion, rust and related repair procedures for certain Class Vehicles.

53.    Through its authorized dealership network, warranty administration, technical service operations, parts distribution, customer-assistance channels, field personnel, and regulatory-reporting functions, VW had superior and exclusive access to information concerning the Subframe Defect. Plaintiff and Class Members, by contrast, did not have access to VW's internal warranty data, aggregate repair information, dealer technical-assistance communications, replacement-part sales

16

data, engineering analyses, or technical service communications before purchasing or leasing their vehicles.

54. VW failed to disclose the Subframe Defect to Plaintiff and Class Members before sale or lease, even though VW possessed superior and exclusive knowledge of the Defect and controlled the principal channels through which such information could have been disclosed to purchasers and lessees, including authorized dealerships, warranty materials, owner-facing communications, marketing materials, certified pre-owned materials, and dealer-facing technical communications.

### The Subframe Defect

55. The Class Vehicles contain a common defect in the subframe architecture. Plaintiff refers to this defect as the "Subframe Defect" or the "Defect."

56. The Defect is present at the time of sale or lease because the defective subframe's problematic subframe coverings are built into the Class Vehicles when they are manufactured. The Defect may not manifest immediately because the subframe's plastic cover conceals the corrosion occurring underneath it over time as described below.

### The Class Vehicles' Subframe Design

57. Many vehicles, including the Class Vehicles, have a subframe that is located on the undercarriage and that spans the width of the vehicle between the two rear wheels. The subframe faces the exterior of the vehicle.

58. The Class Vehicles' subframe is constructed from steel components, which is encased in part by plastic covers, but otherwise exposed to the elements.

17

These plastic covers are fastened to the underside of the subframe and trap water and moisture against the steel subframe, causing and accelerating corrosion that can perforate the subframe hidden from view behind the coverings.

59.     A subframe is an integral structural component of a vehicle. It attaches to the unibody of the vehicle and provides rigid, secure mounting points for the suspension and driveline components. The subframe holds the rear suspension and rear wheels securely to the vehicle.

60.     The wheels of a vehicle encounter significant road forces, which they transfer through the suspension to the subframe. The subframe must be stiff and resilient to stabilize the vehicle's suspension and are therefore constructed from steel.

61.     In addition to providing structural stability to the rear of the vehicle, the subframe plays an important role in crash safety. The subframe absorbs some impact and channels impact forces before they reach the passenger cabin.

### The Defective Rear Subframe Design

62.     Rust can occur through corrosion when iron or an iron alloy, such as steel, is exposed to oxygen and water. Road salt accelerates rust formation by acting as a catalyst in the corrosive process.

63.     Rust can be mild, staying mainly on the surface, or so extensive that it causes holes to form in the metal. When such holes form, the structural integrity of the metal is compromised, leading to perforation and eventually breaking the metal vehicle components.

18

64.    The Defect in the Class Vehicles is caused and accelerated by the plastic covers affixed over the subframe. Instead of protecting the subframe, these plastic covers trap water, road debris, moisture, and salt against the surface of the steel subframe. This design creates conditions whereby water and corrosive materials pool and accumulate between the plastic cover and the steel structure of the subframe, accelerating the corrosion process, which is hidden behind the plastic covers themselves.

65.    Severe corrosion of the type afflicting the subframes of the Class Vehicles can take several years to develop, but initially begins when the vehicle is first exposed to normal environmental conditions such as precipitation, humidity, road salt, and temperature fluctuations. The plastic covers trap these corrosive materials against the steel, rather than allowing them to drain away naturally and compounding the rate of corrosion over time.

66.    Vehicle components, including subframes, are typically constructed of high-quality carbon steel, which is inherently susceptible to rust and corrosion. A properly designed subframe constructed of carbon steel must be coated with anti-corrosion agents sufficient to resist normal environmental conditions and should not incorporate designs, such as plastic covers, that trap water and moisture against the steel structure.

67.    The subframes of the Class Vehicles are constructed of carbon steel and are therefore inherently susceptible to corrosion. That susceptibility is dramatically exacerbated by the plastic covers that are affixed to the subframe, which trap water and moisture and accelerate the corrosion of the steel structure.

19

68.     A non-defective subframe should last the life of the vehicle without requiring replacement. The Class Vehicles, however, are designed with a Rear Subframe Defect that causes the subframe to corrode prematurely, rendering the vehicle unsafe and unreliable.

69.     The subframe is mounted underneath the vehicle, making it difficult to inspect without specifically lifting and examining the undercarriage. Even where an inspection is performed, the plastic covers affixed to the Class Vehicles' subframes obscure the underlying corrosion from view. The subframe continues to rust and corrode such that a visual inspection of the exterior will often fail to reveal the extent of corrosion until the subframe is near failure. As a result, the Rear Subframe Defect is difficult to detect even by a trained mechanic until the corrosion is severe, and the Class Vehicles provide little to no warning before becoming dangerously unstable.

70.     Because a subframe is a structural part of a vehicle that supports other critical components of the car, when a subframe is corroded to the point of perforation or structural instability, it can snap while driving, which can result in wheel or suspension collapse, violent pulling to one side, and loss of control of the vehicle, creating dangerous road conditions and posing not just a safety hazard to the driver, but to passengers and other drivers or pedestrians on or near the road. The dangerous nature of the Subframe Defect is made all the worse by the fact that the perforations and extensive nature of the corrosion is often concealed from view, meaning even experienced technicians might not detect the latent hazard concealed under the plastic coverings without removing them and would have no cause to do so without visibility into such extensive corrosion.One of the most serious

consequences of a compromised subframe is that, in the event of a crash, the subframe is unable to absorb and evenly distribute the force from the impact. When impact forces are not evenly distributed, the structural collapse of the vehicle can occur, placing occupants at substantially greater risk of injury or death.

71.    A Class Vehicle with a perforated or severely corroded subframe cannot be safely driven unless the subframe is replaced. Replacement of the subframe is a time-intensive and costly process that requires removing the rear suspension, rear drivetrain, and wheels from the vehicle, disassembling and removing the defective subframe, and then reassembling all components onto the replacement subframe.

72.    The cost of a subframe replacement, including parts and labor, typically ranges from $4,000 and $9,000 or more. These costs can substantially exceed that range if the Rear Subframe Defect has caused damage to other vehicle components, such as the rear brake lines, suspension components, exhaust system, rear axle, tires, or fuel tank.

73.    Plaintiff and Class Members were injured at the point of sale by not receiving the benefit of their bargain: vehicles free from the Rear Subframe Defect.

74.    Class Vehicles with corroded subframes suffer significant diminution in resale value unless the subframe is repaired or replaced.

75.    Because the Defect causes premature corrosion tied to safety hazards that requires costly repairs, reasonable consumers would consider the Defect material when deciding whether to purchase or lease a Class Vehicle, how much to pay for it, and whether to purchase warranty or service coverage.

21

**The Subframe Defect Poses an Unreasonable Safety Hazard**

76.     The Subframe Defect poses an unreasonable safety hazard. When the plastic covers trap water, salt, and corrosive materials against the subframe rather than allowing the materials to naturally flow away, the subframe suffers from extensive corrosion and rust, including cracks and holes in the subframe, that are localized in the area directly underneath and hidden by the plastic coverings. Often these owners are told that the subframes could fail at any moment, making the vehicles too dangerous to continue driving. Others become aware of the defect when the subframe cracks while they are driving.

77.     These conditions are dangerous because they can cause component parts (essential to the suspension and drivetrain) to fail or break at any time and can cause drivers to lose control of their vehicles while driving. Additionally, the Defect causes the subframe to become structurally compromised in its ability to properly absorb and evenly distribute the force from the impact. A vehicle that exhibits such severe corrosion in an essential structural component causing loss of vehicle control and inadequate structural integrity to withstand collision impacts presents a safety risk to the driver, passengers, other motorists, and pedestrians. The risk is heightened given the latent nature of the Subframe Defect, meaning drivers may not know of cracks or holes in their subframes while driving on the highway, in traffic, or in locations where the driver cannot safely stop.

78.     Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure

of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

79.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Defendant knew or should have known of the many complaints about the Subframe Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendants to the Subframe Defect.

80.     With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Subframe Defect which are available through NHTSA's website, NHTSA.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, have been made aware of the Subframe Defect. In addition, the complaints indicate that despite having knowledge of the Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

### 2010 Audi Q5

a.  **DATE OF INCIDENT:** August 16, 2024
**DATE COMPLAINT FILED:** August 23, 2024
**NHTSA/ODI ID:** 11610368

**SUMMARY:** Rear Subframe has severe rust through caused by plastic covers that trap moisture. This is a danger as the rust is so severe it will impact suspension, lower control arm in the rear. It was not inspected by anyone other than myself. No warning lamps. I noticed one of the plastic pieces hanging down from the vehicle that led me to inspect the cause of this part coming loose.

## 2011 Audi Q5

b. **DATE OF INCIDENT:** May 20, 2022
**DATE COMPLAINT FILED:** May 20, 2022
**NHTSA/ODI ID:** 11465454
**SUMMARY:** During a routine inspection my mechanic noticed the subframe of my 2011 Audi Q5 was rusted through in numerous spots. It seemed odd that a vehicle bought new and garaged since it was purchased had such extensive rust. Pictures of the rusted subframe were taken and shown to the local Audi dealer. The dealer then asked to bring the vehicle in so they could take their own pictures. Contacted Audi NA and spoke with rep about problem. The phone call ended abruptly when the Audi NA rep refused to file a claim and hung up on me.

c. **DATE OF INCIDENT:** April 16, 2025
**DATE COMPLAINT FILED:** April 17, 2025
**NHTSA/ODI ID:** 11655321
**SUMMARY:** Rear subframe rust causing car to fail state inspection. This vehicle has been maintained well and always parked in garage. The rear subframe rusted most, then front subframe. This is a common compliant among Audi forum users.

## 2013 Audi Q5

d. **DATE OF INCIDENT:** March 17, 2024
**DATE COMPLAINT FILED:** October 15, 2024
**NHTSA/ODI ID:** 11619831
**SUMMARY:** The rear subframe has plastic "stone guards" to protect the frame from being damaged in off-road conditions. Where these stone guards are attached, the subframe has rotted/rusted large holes. Water and salt from winter seasons can get trapped behind these guards. A subframe on a vehicle at this age should NOT have complete holes rotted through. Let alone a vehicle brand such as Audi, known for quality. The rear subframe connects the rear suspension and AWD drivetrain to the unibody of the vehicle. This is a major safety concern. It has not been inspected by the manufacturer; my Audi dealer denied this could happen. I am part of a few Audi groups/forums with others facing the same issues, and Audi replacing the subframe under the corrosion warranty. This is a widespread issue amongst the forums. There are no warnings or symptoms as of yet. I noticed the holes

24

3/17/24. The vehicle has been somewhat sufficient to operate. I just don't want to be traveling down the road with my family in the vehicle if the subframe collapses. I am afraid to fully remove the stone guards as others on the forums claimed that Audi would do nothing for them after removing the guards. Being that they are "protection".

e.  **DATE OF INCIDENT:** February 17, 2025
**DATE COMPLAINT FILED:** July 30, 2025
**NHTSA/ODI ID:** 11677300
**SUMMARY:** Took vehicle in for state safety inspection. Found heavy rust on subframe nearly all the way through. Was told if it gets any worse it will not pass inspection next time. Apparently there are plastic rock shields on subframe that trap water causing it to rust. Took it to dealer and they want to charge close to $4000 to replace. This seems like an engineering defect. The vehicle is kept in a garage and doesn't have any other rust on it.

f.  **DATE OF INCIDENT:** April 9, 2026
**DATE COMPLAINT FILED:** May 20, 2026
**NHTSA/ODI ID:** 11739161
**SUMMARY:** There is considerable rust to the point that the subframe has been structurally compromised. I also contacted Audi USA regarding this issue, but they advised that they could not provide any assistance and closed my case. I was instructed to have the vehicle inspected and see what the dealer could do. I have videos and photos documenting the compromised subframe which many Audi Q5 owners have been complaining about.... There are holes approximately the size of a tennis ball.

**2014 Audi Q5**

g.  **DATE OF INCIDENT:** April 2, 2023
**DATE COMPLAINT FILED:** April 30, 2023
**NHTSA/ODI ID:** 11519666
**SUMMARY:** I recently discovered that my Q5 tubular rear subframe/crossmember (part # 8R0505235N) has rusted thru near a bushing that supports the rear transaxle. The rust thru area at the transaxle is about a foot long. This subframe supports the rear axle and all the rear suspension components. I brought my Q5 to the local Audi dealer and they took a video showing two areas on the subframe that have rusted thru, the bushing area supporting the transaxle and also an area supporting the left rear suspension. The dealership did not allow me to take the Q5 back and gave me a loaner vehicle to drive until the

25

subframe can be replaced. The dealership contacted Audi North America and Audi agreed to pay 40% of the cost to replace the rear subframe. I think Audi should pay 100% as this is a serious safety issue. My Q5 has no other areas of corrosion except a slight amount of surface rust on the exhaust and is otherwise in excellent condition with only 50,444 miles. It has always been garaged since purchased new and has been in no accidents. The Audi service tech even complimented me on how clean my Q5 was at 10 years old. PS - How can I include an attachment of the video taken by the Audi dealership?

h. **DATE OF INCIDENT:** September 25, 2024
**DATE COMPLAINT FILED:** February 2, 2025
**NHTSA/ODI ID:** 11640211
**SUMMARY:** Took my vehicle in for an alignment, was told by my local Audi dealer the rear subframe has rotted through and will need to be replaced. I asked how could this happen on a vehicle under 10 years? They said they see a lot of Q5's with similar rust issues due to a design flaw where a plastic protective cover cups and holds water directly on the structural part of the vehicle. They quoted me $8,000 to fix and offered no assistance on the price. Many, MANY others in forums and social media pages have the same issue and are forced to pay out of pocket for this issue caused by Audi.

i. **DATE OF INCIDENT:** March 12, 2025
**DATE COMPLAINT FILED:** March 13, 2025
**NHTSA/ODI ID:** 11648037
**SUMMARY:** There is severe rust in the rear subframe. It's so bad that the rust has made holes right through the subframe - compromising its integrity. This is a serious safety issue as the subframe holds the suspension and wheels and could break at any point. This is not normal wear and tear. This is a manufacturer's defect and a major safety issue that needs to be addressed immediately.

j. **DATE OF INCIDENT:** May 2, 2025
**DATE COMPLAINT FILED:** May 2, 2025
**NHTSA/ODI ID:** 11658523
**SUMMARY:** I took my Audi Q5 TDI to the Garage for servicing and was told of heavy rusting on both sides of the rear subframe. The rusting is bad and can almost break the subframe It seems to be a known issue in Audi Q5 models, however, the dealership and Audi of America have refused to cover it as a manufacturing defect. The car

26

has 88000 miles, and at this point, I think it may not be safe to drive. I am urging NTSB to review this issue and see if the issue can be resolved by the manufacturer at their cost.

k.  **DATE OF INCIDENT:** July 9, 2025
**DATE COMPLAINT FILED:** July 9, 2025
**NHTSA/ODI ID:** 11672270
**SUMMARY:** 2014 Audi Q5 TDI with 115000 miles. Rear subframe inspected individually, by independent shop, and by Audi dealership. Found to have severe rust with perforation underneath where plastic debris covers are mounted. It is currently installed on vehicle at time of complaint. The failure of the subframe can disable the vehicle while driving, disconnect the axle and surrounding components, and cause an accident with one or more vehicles on the road. Audi has a 12 year/unlimited mileage warranty but claims it is not covered under warranty. Repair is quoted around ~$6000 including parts and labor.

l.  **DATE OF INCIDENT:** July 26, 2025
**DATE COMPLAINT FILED:** August 7, 2025
**NHTSA/ODI ID:** 11678953
**SUMMARY:** The front subframe has experienced catastrophic failure due to severe and premature rust-through corrosion. Multiple holes have perforated the component, compromising the vehicle's structural integrity. The part is available for inspection upon request. The safety of my family and others was put at significant risk, as the subframe is the primary component that mounts the engine, suspension, and steering rack to the vehicle. A failure of the subframe while driving could cause a complete loss of steering control and the collapse of the front suspension, leading to a serious or fatal crash. The problem was independently reproduced and confirmed by both an independent service center and an authorized Audi dealership. Both establishments have deemed the vehicle unsafe to drive due to this specific issue. The manufacturer (Audi of America) has been made aware of the issue through their dealership network. They have acknowledged the defect by offering a "goodwill" repair to replace the subframe, confirming their awareness of this failure mode. However, the manufacturer has made this safety-critical repair contingent on the owner first paying for several thousand dollars of unrelated maintenance items, creating a financial barrier that prevents the safety fix from being implemented. There were no warning lamps, messages, or other symptoms prior to the failure's discovery. This is a silent failure that provides no warning to the driver. It was only discovered during a routine service visit when the vehicle was on a lift.

m. **DATE OF INCIDENT:** August 29, 2025

27

**DATE COMPLAINT FILED:** August 30, 2025
**NHTSA/ODI ID:** 11684104
**SUMMARY:** 2014 Audi rear subframe is rusted through. 92,000 Mi. My independent mechanic found the problem when performing suspension work. It has not been inspected by the dealer yet but will be soon. With the history of the subframe failures on these models and years, there is a danger to the public driving these vehicles on the road. Audi needs to fix these problems

n.  **DATE OF INCIDENT:** September 2, 2025
**DATE COMPLAINT FILED:** September 8, 2025
**NHTSA/ODI ID:** 11685613
**SUMMARY:** The rear subframe of my Audi Q5 has extensive rot and holes per an inspection done and deemed unsafe to drive. However I've only had the car about 3 years. To fix this will cost me around $5800.00.

o.  **DATE OF INCIDENT:** July 16, 2025
**DATE COMPLAINT FILED:** December16, 2025
**NHTSA/ODI ID:** 11705300
**SUMMARY:** Vehicle rear subframe comes with plastic covers that trap road salt and cause severe corrosion. Issue only presents itself when plastic covers are removed, revealing rust/corrosion and lost material, and a risk of the subframe to split resulting in lost of vehicle control on the road. This was found as a preventative action due to reports from other car owners and is confirmed by Audi Dealers as a common issue. Labor and parts estimate around $6000 (including $2000 in parts

p.  **DATE OF INCIDENT:** April 1, 2026
**DATE COMPLAINT FILED:** April 5, 2026
**NHTSA/ODI ID:** 11729264
**SUMMARY:** This vintage 2014 Audi A5 has a well known serious rust perforation issue with the rear subframe. The corrosion / rust through of two major holes, approx 3 inches in diameter, causing structural failure of the sub frame. This is a major saftey concern with these cars from model year 2009 thru 2017. The only remedy is replacement of the sub frame under Audi's 12 year rust perforation warranty or good will.

q.  **DATE OF INCIDENT:** March 16, 2026

**DATE COMPLAINT FILED:** April 9, 2026
**NHTSA/ODI ID:** 11730241
**SUMMARY:** Severe corrosion of the rear subframe crossmember on a 2014 Audi Q5 Premium Plus, purchased with 65,464 miles. Two independent inspections in South Carolina confirmed structural failure. Audi of Greenville, an authorized Audi dealership, marked the condition as VERY DANGEROUS on the service invoice and quoted $4,711.52 for subframe replacement. They were unable to perform a wheel alignment due to the severity of the corrosion. Yoder's Automotive in Westminster, SC independently confirmed the subframe was rusted beyond repair on both sides. Fist-sized holes have corroded through the structural metal on both sides of the subframe. The vehicle has plastic stone guard covers bolted over the subframe from the factory. These covers trapped road salt and moisture against unpainted mild steel, accelerating concealed corrosion that was invisible until the covers were removed during inspection. The vehicle is undriveable and has not been driven since the defect was discovered in approximately March 2026. This defect pattern is documented in at least 16 prior NHTSA complaints for Audi Q5 models spanning model years 2010 through 2018. Audi has revised the subframe part number at least five times (8R0505235F through 8R0505235N) but has issued zero recalls and zero consumer notifications.

## 2015 Audi Q5 Quattro

r.  **DATE OF INCIDENT:** August 8, 2025
**DATE COMPLAINT FILED:** August 19, 2025
**NHTSA/ODI ID:** 11681486
**SUMMARY:** 2015 Audi Q5 Quattro (all wheel drive). During recent inspection the vehicle was found to have extreme corrosion, cracking, and structural failure of the rear subframe and subframe crossmember. The rear steel subframe is manufactured as an assembly. The rear subframe assembly supports all of the rear suspension components and rear drivetrain and drivetrain components. My vehicle is always garaged and no other corrosion was found during inspection of the entire vehicle. The finding is a manufacturing defect that is only isolated to the rear subframe assembly of the vehicle. Due to the extreme nature of corrosion and cracking found on the subframe assembly this should be considered a high priority warning for Audi Q5 owners. A total failure of all rear suspension and drivetrain

components may result.

**2015 Audi Q5 TDI**

s.  **DATE OF INCIDENT:** June 12, 2025
**DATE COMPLAINT FILED:** June 19, 2025
**NHTSA/ODI ID:** 11667941
**SUMMARY:** To Whom It May Concern, I am writing to formally report a serious safety issue involving my 2015 Audi Q5 TDI (VIN # [XXX] ), which has developed severe corrosion on the rear subframe. I am the original owner of this vehicle, which has 92,700 miles and has been garage-kept and exclusively serviced by authorized Audi dealerships since purchase. On [XXX], following a failed Virginia State safety inspection, the vehicle was inspected by Audi of Chantilly, VA. Their service department confirmed that the rear subframe is cracked due to extensive rust and recommended immediate repair. I have attached both the inspection report and supporting photographs. This is not an isolated case. Numerous Audi Q5 owners have documented similar corrosion on the rear subframe, often attributed to a plastic cover that traps moisture and accelerates rusting. This appears to be a design defect with potentially dangerous implications. As it stands, the vehicle is not drivable. The compromised subframe poses a serious risk of structural failure while in motion, increasing the potential for loss of control, a crash, or injury. The dealership has estimated repairs at over $9,000, which I am currently seeking coverage for through Audi Customer Service. However, Audi has indicated that their corrosion warranty covers only body panels—not subframe components—despite the fact that the defect stems from their design. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

**2015 Audi Q5**

t.  **DATE OF INCIDENT:** October 10, 2023
**DATE COMPLAINT FILED:** October 10, 2023
**NHTSA/ODI ID:** 11549773
**SUMMARY:** The contact owns a 2015 Audi Q5. The contact stated that after taking the vehicle to the dealer for service, the dealer determined that the vehicle was unsafe to drive due to severe rust on the rear subframe. The vehicle was not repaired. The manufacturer was notified of the failure, and a case was opened. The failure mileage was 75,200

30

u.  **DATE OF INCIDENT:** October 10, 2023
**DATE COMPLAINT FILED:** October 13, 2023
**NHTSA/ODI ID:** 11549773
**SUMMARY:** The contact owns a 2015 Audi Q5. The contact stated that after taking the vehicle to the dealer for service, the dealer determined that the vehicle was unsafe to drive due to severe rust on the rear subframe. The vehicle was not repaired. The manufacturer was notified of the failure, and a case was opened. The failure mileage was 75,200.

v.  **DATE OF INCIDENT:** July 9, 2024
**DATE COMPLAINT FILED:** July 19, 2024
**NHTSA/ODI ID:** 11603316
**SUMMARY:** The Audi Q5 was new in 2015 and I am the original owner. The vehicle has 135,600 miles on it. During an oil change visit to my repair shop, they informed me of significant rust corrosion to the subframe. My Audi dealer in Chantilly acknowledged that subframe rust was a design flaw on model years 2014, 2015, and 2016. Audi will not cover this under their 12 Year Rust Corrosion Perforation warranty. I believe this to be a significant safety hazard to the owners and their families who are still driving their Q5 without knowledge of the impending disaster. Impending disaster could be a subframe collapse at highway speed.

w. **DATE OF INCIDENT:** May 30, 2024
**DATE COMPLAINT FILED:** July 11, 2024
**NHTSA/ODI ID:** 11601316
**SUMMARY:** Audi Dealer inspection report said severe rear sub frame rust is a safety issue and requires replacement

x.  **DATE OF INCIDENT:** July 10, 2024
**DATE COMPLAINT FILED:** July 10, 2024
**NHTSA/ODI ID:** 11600822
**SUMMARY:** The contact owns a 2015 Audi Q5. The contact stated when the vehicle was driven to the independent mechanic for an inspection for a possible oil leak, the mechanic observed that there was a significant amount of corrosion on the rear sub frame of the vehicle. The contact was advised by the mechanic that the vehicle was unsafe to drive due to the extreme corrosion of the rear sub frame. The vehicle

31

was not taken to a dealer to be diagnosed or repaired. The vehicle was not repaired. The manufacturer was not informed of the failure. The failure mileage was approximately 110,000.

y.  **DATE OF INCIDENT:** August 13, 2025
**DATE COMPLAINT FILED:** August 22, 2025
**NHTSA/ODI ID:** 11682386
**SUMMARY:** Rear subframe rusted out at only 85,000 miles

z.  **DATE OF INCIDENT:** January 27, 2026
**DATE COMPLAINT FILED:** January 19, 2026
**NHTSA/ODI ID:** 11713660
**SUMMARY:** The contact owns a 2015 Audi Q5. The contact stated that the rear subframe was extremely rusted and could not pass a safety inspection. The vehicle was driven to the dealer, but the vehicle was not repaired. The manufacturer was not notified of the failure. The failure mileage was 82,351.

**2016 Audi Q5**

aa. **DATE OF INCIDENT:** May 3, 2026
**DATE COMPLAINT FILED:** May 3, 2026
**NHTSA/ODI ID:** 11735390
**SUMMARY:** Mechanic was checking the car and noticed subframe is rusted through underneath the plastic cladding. Audi dealers should cover this under warranty as it's a safety issue. This happened due to poor designing.

**2017 Audi Q5**

bb. **DATE OF INCIDENT:** May 14, 2026
**DATE COMPLAINT FILED:** May 14, 2026
**NHTSA/ODI ID:** 11737878
**SUMMARY:** My rear subframe is completely rotted out and the dealership I bought it from but a new inspection sticker sold it to me and told me it was perfect condition.

32

**Customer Complaints on Third-Party Websites**

81.    Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate VW's awareness of the problems with the subframe system and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and with VW itself themselves, but also because VW employs staff to monitor the perception of the brand. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

82.    On carcomplaints.com, a consumer of a 2015 Audi Q5 posted the following:

> The contact owns a 2015 Audi Q5. The contact stated that after taking the vehicle to the dealer for service, the dealer determined that the vehicle was unsafe to drive due to severe rust on the rear subframe. The vehicle was not repaired. The manufacturer was notified of the failure, and a case was opened. The failure mileage was 75,200

83.    On AudiWorld.com, a consumer of a 2016 Audi SQ5 posted the following:

> Hey folks, I'm curious whether others are seeing rust underneath our Q5's -- especially in the rear. I just did a rear suspension replacement on my 2016 SQ5 and was surprised by how much rust I saw. of course the bolts, but also the thigns like headlight leveler, and even some on the rear subframe. I'm going to get under there and see if it's anything more than some surface rust to address. Wanted to see if there are others running into this and any BTDT?

33

84.    On the r/Justrolledintotheshop forum on reddit.com, a consumer of a Audi Q5 posted the following:



85.    On the r/Audi forum on reddit.com, a consumer of a 2015 Audi Q3 posted the following:



86.    On the r/Audi forum on reddit.com, a consumer of a 2010 Audi Q5 posted the following:



r/Audi · 3 mo. ago
Bathroom-Salt

## 2010 Q5 - Rear Subframe Replacement

Discussion

Morning Reddit, I took my 2010 Q5 (122K) to the dealer last week and they called me back in a few days and informed me that they could not work on my car due to the rear subframe being rotted. Honestly, I was just expecting a large bill rather than a "sorry, can't help" but for whatever reason, they wouldn't touch it and asked me to pick it up.

I brought it to my local mechanic who threw it on a lift and we took a look and found the rust damage they were referring to. He's confident he can replace it, but we're collaborating on trying to locate one to put in there. It looks like I can buy new directly from Audi, but there's also a bunch of salvage yards on eBay that seem to have the part available for about 1/10 of the OEM price.

My question is, considering it's a 14 year old car, do I put in the effort to find a used one and save a few bucks, or do I just eat the $1200 and put a new one on there? Curious if anyone else has had a similar repair done, and if you went new or used for the replacement.

TIA!

-Salt

87.    On the r/Audi forum on reddit.com, a consumer of a 2015 SQ5 warned other Audi owners to inspect their Q5/SQ5 subframes, posting the following:



← 🔵 r/Audi · 1y ago
probmxstyle

## If You Have a B8 Q5/SQ5 Check your Subframe

Was doing the rear brakes on my garage kept 70k mile 2015 SQ5 and noticed some rust. After further inspection, I found gaping holes in my rear subframe under the plastic covers. Had it replaced and the shop said they have been seeing them more and more.

## DEFENDANT HAD SUPERIOR AND EXCLUSIVE KNOWLEDGE OF THE SUBFRAME DEFECT

88.    VW had superior and exclusive knowledge of the Subframe Defect and knew that the Defect was not known or reasonably discoverable by Plaintiff and Class Members before they purchased or leased the Class Vehicles. The Defect

concerns internal subframe components that ordinary consumers cannot inspect or evaluate before purchase or lease.

89.    Plaintiff and Class Members could not reasonably discover the Defect through ordinary pre-purchase inspection, test driving, review of marketing materials, review of window stickers, review of warranty materials, or routine maintenance. The Defect can only be revealed after removing the plastic coverings of the subframe.

90.    VW, by contrast, had access to information unavailable to ordinary consumers, including pre-release testing, durability testing, thermal and pressure-cycle testing, design failure mode and effects analyses, engineering analyses, warranty claims, goodwill claims, technical assistance requests, dealer repair orders, replacement-part sales data, field reports, customer-assistance contacts, dealer audits, aggregate repair data, NHTSA complaints, and dealer-facing technical service materials subframes and corrosive conditions.

91.    VWGoA's authorized dealerships were an important source of VW's knowledge. Authorized dealerships diagnose Class Vehicles, perform warranty and goodwill repairs, submit warranty and goodwill claims to VWGoA, identify failed components, order replacement parts, document customer complaints, and communicate with VWGoA concerning recurring repair conditions. When a dealership seeks reimbursement for a warranty or goodwill repair, it must provide VWGoA with sufficient information concerning the customer complaint, diagnosis, failed component, labor operation, parts used, and repair performed. VW, through VWGoA therefore receives and maintains information that allows it to identify

37

recurring subframe corrosion and replacement trends across vehicles, models, model years, engines, parts, and dealerships.

92. VW's warranty, technical service, engineering, customer relations, and parts departments collect, review, and analyze this information in the ordinary course of business. Those departments track warranty repairs, goodwill requests, dealer technical inquiries, parts demand, customer complaints, field data, and repair trends to identify recurring vehicle conditions and to determine whether to issue technical service bulletins, special service messages, manufacturer communications, repair procedures, parts updates, service campaigns, recalls, warranty extensions, or other corrective actions.

93. VW is an experienced vehicle manufacturer, distributor, warrantor, and technical-service administrator. Before selling the Class Vehicles, VW and/or its affiliated entities tested, validated, specified, approved, and monitored the Class Vehicles' subframes and plastic subframe coverings, and related components. VW therefore knew or should have known that the subframe was susceptible to rot, rust, and corrosion because of the plastic subframe coverings.

94. By the time Plaintiff purchased or leased their Class Vehicles, VW knew or should have known that Class Vehicles were experiencing recurring subframe rust and corrosion conditions.

95. VWGoA's dealer-facing technical service materials confirm its knowledge of recurring subframe system failures in the Class Vehicles. Notwithstanding that not every technical service bulletin or service message applied to every Plaintiff vehicle and that not every technical document identified the same

leak point, these materials show that VW was aware of recurring subframe rust and corrosion in Class Vehicles and addressed those conditions through dealer-facing channels rather than owner-facing disclosures.

96.     VW's knowledge is further confirmed by Plaintiff's repair experiences, which mirror the subframe conditions VW was tracking. For example, Plaintiff Behm's authorized VW dealership found a rusted subframe during a routine service visit and acknowledged that they see subframe rust and corrosion frequently.

97.     Despite its superior and exclusive knowledge, VW did not disclose the Defect to Plaintiff and Class Members before sale or lease. VW did not disclose that the Class Vehicles' subframes were subject to severe rust and corrosion due to the plastic subframe coverings. Instead, VW continued to market, distribute, warrant, sell, and lease the Class Vehicles while addressing recurring subframe corrosion issues through dealer-facing technical service channels and piecemeal component repairs, or simply allow the corrosion to develop in severity unbeknownst to Plaintiff and Class Members.

98.     The existence of the Defect is material. Reasonable consumers do not expect a vehicle's subframe to rot, rust, or corrode.

99.     Had Plaintiff and Class Members known of the Defect before purchasing or leasing their Class Vehicles, they would not have purchased or leased the vehicles, would have paid less for them, would have purchased or leased different vehicles, would have purchased additional warranty or service coverage, and/or would have required that the defective subframe and related components be replaced

39

with non-defective components before purchase, lease, or expiration of applicable warranty coverage.

**DEFENDANTS' OMISSIONS AND MISREPRESENTATIONS REGARDING THE CLASS VEHICLES**

100. Notwithstanding VW's knowledge of the Defect, VW marketed the Class Vehicles as safe, reliable, durable, high-performance vehicles suitable for ordinary transportation. VW did not disclose the Defect in its statements or materials concerning the Class Vehicles, including brochures, Monroney stickers, warranty booklets, owner's manuals, websites, advertisements, press materials, and authorized-dealer communications. VW's materials consistently touted the safety, performance, refinement, durability, and reliability of the Class Vehicles, without disclosing that the vehicles' subframe was prone to premature severe rust and corrosion of the subframe itself and other component parts essential to the suspension and drivetrain, resulting in loss of use, expensive repairs, and exposure to safety risks such as loss of vehicle control and increased impacts in collisions.

101. VW did not disclose in these materials that the Class Vehicles' subframes were prone to premature corrosion and failure, or that such corrosion could cause loss of vehicle control, damage to other parts, and expensive repairs.

102. VW also promoted the Class Vehicles' safety and technology features, including infotainment systems, high-performance brakes, LED headlights, and advanced driver-assistance systems, including camera-based driver assistance features.

40

103. VW failed, however, to disclose that the Class Vehicles contained a defect in the subframe that could cause severe rust and corrosion, loss of use, expensive repairs, and safety-related drivability issues. VW did not disclose the Defect in the brochures themselves or in the owner's manuals and warranty materials to which consumers were directed for additional information.

104. VW had numerous opportunities to warn prospective purchasers and lessees that the Class Vehicles contained the Defect, including through brochures, commercials, websites, press materials, fact sheets, Monroney stickers, warranty booklets, owner's manuals, certified pre-owned materials, authorized-dealer communications, and other consumer-facing disclosures. VW did not disclose that the Class Vehicles' subframes were prone to premature failure under ordinary operating conditions.

105. Had VW disclosed the Defect, Plaintiff and Class Members would not have purchased or leased the Class Vehicles, would have paid less for them, would have purchased or leased different vehicles, would have purchased additional warranty or service coverage, and/or would have required that the defective subframe components be replaced with non-defective components before purchase, lease, or expiration of applicable warranty coverage.

**DEFENDANT ACTIVELY CONCEALED THE SUBFRAME DEFECT**

106. Despite its knowledge of the Defect, VW concealed the existence and nature of the Defect from Plaintiff and Class Members. Specifically, VW failed to disclose or concealed, at and after the time of purchase, lease, or repair:

a. that the Class Vehicles contained subframes that were prone to premature severe corrosion;

b. that the Class Vehicles' subframe corrosion could cause premature failure and breakage of other component parts, under ordinary use and driving conditions;

c. that the Defect could cause loss of use, expensive repairs, and exposure to safety risks such as loss of vehicle control and increased impacts in collisions; and

d. that VW had received information through warranty claims, dealer repair data, technical assistance requests, replacement-part demand, customer complaints, NHTSA complaints, and dealer-facing technical service materials concerning recurring subframe rust and corrosion conditions in the Class Vehicles.

107. The Defect is latent in that the corrosion is hidden underneath the plastic covers. Many owners first learn that their subframes are dangerously corroded when they bring their vehicles in for another issue and the mechanic takes off the vehicle's plastic subframe coverings, which conceal the dangerous corrosion beneath. Although the Defect has been known to Defendants for years, VW and its authorized dealerships do not address the problem until consumers take their vehicles in for other unrelated issues and are forced to confront the extensive corrosion after the plastic cover is removed.

108. Plaintiff and Class Members did not receive the value for which they bargained when they purchased or leased the Class Vehicles.

42

109. As a result of the Defect, the value of the Class Vehicles has diminished, including the resale value of the Class Vehicles.

**DEFENDANT HAS UNJUSTLY RETAINED A SUBSTANTIAL BENEFIT**

110. Discovery will show that Defendant unlawfully failed to disclose the alleged Defect to induce Plaintiff and Class Members to purchase or lease the Class Vehicles, to pay more for the Class Vehicles than they otherwise would have paid, purchase warranty or service coverage, and continue paying for diagnosis, replacement parts, and repairs related to subframe corrosion and relatedly corroded essential parts.

111. Plaintiff alleges that VW engaged in deceptive acts and practices in connection with all transactions involving the Class Vehicles, including Plaintiff's purchase, by concealing a material defect that was known to VW and not reasonably discoverable by consumers before purchase or lease.

112. As discussed above, therefore, Plaintiff alleges VW unlawfully induced them to purchase or lease the Class Vehicles by concealing material facts concerning the Defect. Plaintiff would have paid less for their Class Vehicles, purchased or leased different vehicles, purchased additional warranty or service coverage, required repair before purchase or lease, or not purchased or leased the Class Vehicles at all had they known of the Defect.

113. Accordingly, to the extent permitted by applicable law, VW should be required to restore, disgorge, or otherwise provide restitution for benefits unjustly retained as a result of its omissions and concealment, including amounts attributable to overpayment, diminished value, replacement parts, diagnosis, and repairs related

to the Defect. Defendants' ill-gotten gains and benefits accrued in the form of increased sales and profits resulting from the material omissions that did—and likely will continue—to deceive consumers, should be disgorged.

## THE AGENCY RELATIONSHIP REGARDING THE VEHICLE WARRANTIES BETWEEN VOLKSWAGEN GROUP OF AMERICAN, INC. D/B/A AUDI OF AMERICA AND ITS AUTHORIZED DEALERS

114. In order to sell vehicles to the general public, Defendant VWGoA enters into agreements with its networks of authorized dealerships to engage in retail sales with consumers such as Plaintiff while also advertising the warranties provided by VWGoA directly to consumers when they purchase an Audi-branded vehicle from the authorized dealership. These agreements specifically authorize the dealerships to act in VWGoA's stead to provide repairs under the warranties VWGoA provides directly to consumers. Accordingly, discovery will show, particularly with respect to the dealership agreements between Defendant and third-party dealerships, that Defendant has authorized these dealerships to be its agents for the purposes of warranty repairs, including diagnosis of whether warranty repairs are required, and as such, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase and receive warranty repairs locally. Discovery will show that because Plaintiff and members of the Class are third-party beneficiaries of the dealership agreement which create an implied warranty of merchantability of the goods being sold by these authorized dealerships, they may avail themselves of the implied warranty against Defendant. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied

44

warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

115.    Further, Plaintiff and each of the members of the Class are the intended beneficiaries of the express and implied warranties which accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by VWGoA. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

116.    VWGoA issued the express warranty to Plaintiff and the Class Members. VWGoA also developed and disseminated the owner's manuals and warranty booklets which direct consumers to take their vehicles to authorized dealerships for diagnosis and repair. VWGoA also developed and disseminated advertisements such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles and promoting the terms of the warranties that they issue with the sale of each Class Vehicle. VWGoA are also responsible for the content of the Monroney Stickers on their vehicles. Because they issue the express warranties directly to the consumers, the consumers are in direct privity with VWGoA with respect to the warranties.

117.    In promoting, selling, and repairing their defective vehicles, Defendant acts through numerous authorized dealers who act as (and represent themselves to the public as) exclusive Audi representatives and agents, particularly for the purpose of providing repairs that are the responsibility of VWGoA to provide under their

45

respective warranties. That the dealers act as Defendants' agents for this purpose is demonstrated by the following facts:

a. The authorized Audi dealerships complete all service and repair according to VWGoA's instructions, which VWGoA issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents;

b. Technicians at Audi dealerships are required to go to at least yearly VWGoA-given trainings in order to remain certified to work on Audi-branded vehicles, at which they receive training on VW-proprietary systems such as the ODIS which provides guided, step-by-step instructions on diagnosing and repairing Audi-branded vehicles;

c. Consumers are able to receive services under VWGoA's issued New Vehicle Limited Warranty only at VWGoA's authorized dealerships, and they are able to receive these services because of the agreements between VWGoA and the authorized dealers. These agreements provide VWGoA with a significant amount of control over the actions of the authorized dealerships;

d. The warranties provided by VWGoA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

e. VWGoA control the way in which their authorized dealers can respond to complaints and inquiries concerning defective vehicles,

46

and the dealerships are able to perform repairs under warranty only with VWGoA's authorization;

f. VWGoA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, particularly through directed step-by-step ODIS instructions, and the dealerships are able to perform repairs under warranty only with VWGoA's authorization;

g. VWGoA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising; and

h. VWGoA implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized VWGoA dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

118. Indeed, VWGoA's warranty booklets make it abundantly clear that VWGoA's authorized dealerships are its agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at their "authorized Audi dealer." For example, the warranty booklets state, "[a]ny authorized Audi dealership in the United States, including its territories, will honor this warranty." Further, the warranty "only applies to vehicles or parts and accessories that are imported or distributed by Audi, and vehicles original sold by an authorized Audi dealer in the

47

United States, including its territories." Under the terms of the warranty repairs will be provided by "[y]our Audi dealer." The booklets direct Plaintiff and class members, should they have a problem or concern, to "discuss them first with management personnel at your authorized Audi dealership. In the event your dealership does not respond to your satisfaction, Audi offers additional assistance. You may contact the Audi Customer Experience Center via telephone or mail as well as email, chat, Twitter, and Facebook…A Customer Advocate, in conjunction with authorized Audi dealer, will work with you to gather and review all the facts relating to your concern."

119. Further, VWGoA d/b/a Audi of America also offers certain "complimentary services," including a pre-delivery inspection and the first maintenance on the vehicle free of charge. Both of these services are actually completed by "your authorized dealer." For example, "[p]rior to delivery, your authorized Audi dealer completed an extensive and detailed inspection of your vehicle." Further, consumers are directed to "contact your authorized Audi dealer to schedule" their complimentary first service.

120. Moreover, as noted by VWGoA on its website describing the Audi Certified Pre-Owned program, the vehicles are actually inspected and certified by technicians at authorized dealerships., meaning also that Audi. In touting its "300+ Point Dealer Inspection," VWGoA states, "[o]nly once the vehicle passes a detailed dealer inspection does it earn the right to be part of the Audi Certified pre-owned program." As such, authorized Audi dealerships inspect used vehicles on VWGoA's behalf and the dealer's certification of quality of these vehicles is sufficient under

standards published by VWGoA that is enough to bind VWGoA to the more generous warranty terms of the Certified Pre-Owned Warranty. As stated on the website, "only after this exhaustive dealer inspection are we confident in backing the vehicle with our Audi Certified pre-owned Limited Warranty." Moreover, the website also states that such vehicles are "rigorously inspected by Audi trained technicians to ensure each Audi Certified pre-owned vehicle is in optimal condition."[1]

121. Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendants for the purposes of the warranties, which are direct contracts between VWGoA and the purchasers of their branded vehicles. Plaintiff and each of the members of the Class have had sufficient direct dealings with either VWGoA or their agent dealerships to establish privity of contract between VWGoA, on one hand, and Plaintiff and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Class Members, including Plaintiff, and Defendant. It also establishes that Plaintiff was dealing with Defendant through its authorized agent dealerships when given the New Vehicle Limited Warranty and Corrosion Perforation Warranty associated with their vehicles, without any ability to negotiate the terms of that Warranty.

---

[1] *See* https://www.audiusa.com/us/web/en/shopping-tools/certified-pre-owned.html (last visited July 15, 2021).

## DEFENDANTS' WARRANTIES ARE UNCONSCIONABLE

122.    Plaintiff signed a contract for sale with Defendants' authorized dealer, and with that sale, was presented with a separate Warranty as drafted by VW and offered by VWGoA d/b/a Audi of America. Although Class Members like Plaintiff had some ability to negotiate vehicle price, they had no ability to negotiate the terms of the Warranty. Plaintiff and other Class Members had no bargaining power with respect to the Warranty, were presented with it as a *fait accompli*, and had to accept it in the exact form in which it was presented to them. Plaintiff and other Class Members  had no meaningful choice regarding any aspect of the Warranty or its terms, including durational limitations of time and mileage. The terms of the warranty unreasonably favored VWGoA over Plaintiff and the members of the Class; a gross disparity in bargaining power existed as between VWGoA and Class Members; and VWGoA knew or should have known that the Subframe Defect would manifest in the Class Vehicles both before and after the Warranty, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

123.    VWGoA drafted the terms of the Warranty in part by using their exclusive, superior knowledge of the existence and likely manifestation of the Defect. Plaintiff and Class Members were entirely ignorant of the Defect when purchasing their Vehicles and when presented with the Warranty. Plaintiff's acceptance of the Warranty and its terms, including any disclaimers or durational limits, was neither knowing nor voluntary. VWGoA knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely because of a defect in design, materials, and workmanship, to wit, the

50

Subframe Defect. Plaintiff and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing the Class Vehicles. For this reason, the terms of the Warranty unreasonably favored VWGoA over Plaintiff and Class Members, and Plaintiff's and Class Members' acceptance of the Warranty's durational limitations (to the extent they are found to apply so as to exclude instances where the Defect manifested outside of them) was neither knowing nor voluntary, thereby rendering such limitation unconscionable and ineffective.

124. Defendants' exclusive superior knowledge of the existence of the Defect and when it would manifest influenced its analysis of the Defect and whether it should pay for a recall (*i.e.,* if a defect is more likely to manifest within the durational limits, a recall is only fractionally more expensive than warranty repairs; if it is more likely to manifest outside those limits, a recall is exponentially more expensive than warranty repairs.)

125. Plaintiff and other Class Members were also not aware and could not have been aware that VWGoA would willfully not inform them of the Defect, which affects the safety of their vehicles and that could manifest outside of the durational limit of the Warranty, despite Defendants' knowledge of this. *See Carlson v. Gen. Motors Corp.*, 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990) (""[P]roof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged 'durational limitations' on implied warranties constituted 'overreaching,' and that the disclaimers themselves were therefore 'unconscionable.'").

## TOLLING OF THE STATUTE OF LIMITATIONS

### A.    Fraudulent Concealment

126.   As previously described, any applicable statute(s) of limitations has been tolled by VW's knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Class could not have reasonably discovered the nature of the Defect prior to this class action litigation being commenced.

127.   VW was and remains under the continuing duty to disclose to Plaintiff and members of the Class the true character, quality, and nature of the Class Vehicles' Defect, including that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles. As a result of the active concealment by VW, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

128.   VW has known of the Defect in the Class Vehicles since at least 2009, and has concealed from, or failed to, notify Plaintiff, Class Members, and the public of the full and complete nature of the Defect, even when directly asked about it by Plaintiff and Class Members during communications with VWGoA, VWGoA Customer Assistance, VWGoA dealerships, and VWGoA service centers. VW continues to conceal the Defect to this day.

### B.    Estoppel

129.   VW was, and is, under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles. VW actively concealed—and continues to conceal—the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality

52

and durability of the Vehicles. Plaintiff and Class Members reasonably relied upon VW's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, VW is estopped from relying on any statutes of limitation in defense of this action.

### C.   Discovery Rule

130.   The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles suffered from the Defect.

131.   However, Plaintiff and Class Members had no realistic ability to discern that the Class Vehicles were defective until—at the earliest—the Defect caused Class Vehicles' subframe and other affected suspension and drivetrain components to need repeated repair, prematurely fail, or require costly replacement.

132.   Even then, Plaintiff and Class Members had no reason to know that such failures, or the pre-failure symptoms described above, were caused by a defect in the Class Vehicles because of VW's active concealment of the Defect. Not only did VW fail to notify Plaintiff or Class Members about the Defect, but also VWGoA, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it.

133.   Thus, Plaintiff and Class Members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing the Class Vehicles' subframe and other affected suspension and drivetrain components to prematurely fail or require costly replacement, including replacements just outside of warranty.

## EQUITABLE RELIEF IS NECESSARY

134.    Recourse to the equitable powers of the Court, and relief in equity, is necessary here in order to provide complete, practical, prompt, and efficient relief to Class Members. This is particularly true given that, as a practical matter for the Class, receiving notice of the Defect and an effective repair or repair program during their ownership of the Class Vehicles is of critical importance.

135.    First, Plaintiff, on behalf of themselves and the Class Members, seek equitable relief in this matter in the form of prospective injunctive relief.

136.    Plaintiff seeks an injunction requiring VWGoA, to the extent permitted by applicable law, to provide a prompt, complete, and effective repair program for the Class Vehicles that remedies the Defect and addresses related subframe components unduly worn or damaged as a result of the Defect.

137.    Additionally, Plaintiff seeks an injunction requiring VW to provide fulsome and comprehensive notice to Class Members regarding the existence of the Defect in their vehicles, VW's knowledge thereof, the attendant risks to vehicle componentry, the attendant safety concerns and risks, and the availability of any relief, including any repair program, warranty extension, reimbursement program, or other relief ordered by the Court or otherwise made available by VWGoA.

138.    To that end, Plaintiff seeks an injunction requiring VWGoA, to the extent permitted by applicable law, to provide direct notice reasonably calculated to reach current and former owners and lessees of the Class Vehicles, including notice containing the above-referenced disclosures regarding the Defect, its symptoms, its risks, and the relief available to Class Members.

139. Unless restrained by this Court, VW will not provide complete notice to Class Members regarding its knowledge of the Defect, the Defect's effect on the vehicles' subframe componentry, the Defect's attendant safety risks, and the availability of relief to repair, reimburse, or otherwise remedy the Defect and its consequences.

140. Plaintiff further seeks equitable relief requiring VW to provide reimbursement for costs incurred to diagnose and repair the Defect and related damage, including costs for parts, labor, towing, rental cars, alternative transportation, and other reasonably related expenses. Plaintiff further seeks, where appropriate, administration of reimbursement claims through an independent third-party administrator to ensure fairness and efficiency.

141. Legal remedies are inadequate to obtain the above-referenced outcomes, including fulsome and complete notice to Class Members, notice of the active and ongoing downstream mechanical effects of the unrepaired Defect, and notice of the Defect's safety risks. Nor are legal remedies adequate to require VW to devise and implement a prompt, complete, and effective repair program that can be applied to Class Vehicles. Nor are legal remedies equally prompt, certain, or efficient in providing Class Members with notice, repair relief, warranty-related relief, and reimbursement for unreimbursed costs caused by the Defect.

142. Likewise, Plaintiff seeks equitable relief in the form of restitution, reimbursement, and other equitable monetary relief for Class Members who, because of the high anticipated cost of repairing or replacing subframes and related components damaged by the Defect, had to sell or trade in their vehicles at a

significant loss, had their vehicles repossessed, or were forced to continue making payments on non-functioning or diminished-value vehicles.

143. As with the injunctive relief discussed above, legal remedies are likewise inadequate. For example, the legal remedies available to Plaintiff for breach of express warranty may require Plaintiff to show that they presented their vehicles to a VWGoA dealership for repair before the expiration of the applicable warranty period.

144. Additionally, in furtherance of the foregoing, Plaintiff seeks specific performance, to the extent permitted by applicable warranty terms and applicable law, requiring VW to perform warranty repairs necessary to remedy the Defect, and declaratory relief as to Plaintiff's and Class Members' rights to receive such repairs, reimbursement, warranty coverage, or other relief relating to the Defect.

145. Finally, Plaintiff seeks, and is entitled to seek, remedies in the alternative at the pleading stage. At this early stage of litigation, it is unclear which claims will be certified, which remedies will be available under which claims, and which remedies will be necessary to provide complete relief to Plaintiff and Class Members.

## CLASS ACTION ALLEGATIONS

146. Plaintiff brings this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

147. The Class and Sub-Classes are defined as:

**Class**: All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**Maryland Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the State of Maryland or were residents of the State of Maryland at the time of purchasing or leasing a Class Vehicle.

**Virginia Sub-Class**: All persons and entities who purchased or leased a Class Vehicle in the Commonwealth of Virginia or were residents of the Commonwealth of Maryland at the time of purchasing or leasing a Class Vehicle.

148. Excluded from the Class and Sub-Classes are: (1) Defendants, any entity or division in which Defendants has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

149. Numerosity: Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and

records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

150. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Class in that Plaintiff, like all Class Members, purchased or leased Class Vehicles designed, manufactured, distributed, marketed, warranted, and/or sold by Defendant. Plaintiff, like all Class Members, has been damaged by Defendants' misconduct because they purchased or leased vehicles containing the Subframe Defect, overpaid for their vehicles, received vehicles worth less than represented, and/or incurred or will incur costs associated with diagnosing, repairing, or replacing defective subframes and relatedly damaged components. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

151. <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiff and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

a.   Whether the Class Vehicles suffer from the Subframe Defect;

b.   Whether the Subframe Defect constitutes an unreasonable safety risk;

c.   Whether Defendants knew about the Subframe Defect and, if so, how long Defendants have known of the Defect;

d.   Whether the existence of the Subframe Defect constitutes a material fact;

e.   Whether Defendants had an ongoing duty to disclose the Subframe Defect to Plaintiff and Class Members;

f.      Whether Plaintiff and the other Class Members are entitled to equitable relief, including preliminary and/or permanent injunctive relief;

g.      Whether Defendants knew or reasonably should have known of the Subframe Defect before they sold, leased, distributed, marketed, or warranted the Class Vehicles;

h.      Whether Defendants should be declared financially responsible for notifying Class Members of the Subframe Defect and for the costs and expenses of diagnosing, repairing, and replacing defective subframe components;

i.      Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace defective subframe components;

j.      Whether Defendants breached the implied warranty of merchantability under applicable state law and, derivatively, the Magnuson-Moss Warranty Act;

k.      Whether Defendants breached express warranties under Maryland and other applicable state laws; and

l.      Whether Defendants breached express warranties under applicable state law and, derivatively, the Magnuson-Moss Warranty Act.

152.    <u>Adequate Representation</u>: Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiff intends to vigorously prosecute this action.

153.    <u>Predominance and Superiority</u>: Plaintiff and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most

59

Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

## COUNT I
## BREACH OF EXPRESS WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2303, *et seq*.)
### (On Behalf of Plaintiff in His Individual Capacity Against VWGoA)

154.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

155.    Plaintiff brings this count on behalf of himself in his individual capacity against Defendant.

156.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

157.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

158.    VWGoA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

60

159.    The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

160.    VWGoA provided Plaintiff and/or his Class Vehicles with written express warranties, including the New Vehicle Limited Warranty, the Corrosion Perforation Warranty, certified pre-owned warranty coverage where applicable, replacement-part warranties where applicable, and/or other VWGoA-issued or VWGoA-administered written warranties. These warranties became a material part of the bargain.

161.    The subframe components affected by the Defect were manufactured, installed, supplied, warranted, and/or caused to be installed by VWGoA or its affiliated entities and are covered by VWGoA's express warranties to the extent they fail because of defects in materials or workmanship during the applicable warranty period.

162.    In a section entitled "New Vehicle Limited Warranty," VWGoA's express warranty, the "New Vehicle Limited Warranty," provides, in relevant part, that VWGoA will provide warranty services when the vehicle is brought to an authorized VWGoA retailer. The authorized VWGoA retailer will, without charge for parts or labor, either repair or replace the defective part(s) using new or authorized remanufactured parts. The Corrosion Perforation Warranty expressly extends this warranty for 12 years for rust perforation in the vehicle body.

163. VWGoA breached its express warranties by selling, leasing, distributing, and warranting Class Vehicles equipped with defective subframe components; by failing to repair or replace defective subframe components when Plaintiff presented his vehicle for repair during the applicable warranty period or under applicable warranty coverage; by providing ineffective, incomplete, stopgap, or piecemeal repairs that failed to remedy the Defect; and/or by refusing to cover repairs for subframe components that failed as a result of the Defect. VWGoA has failed to repair the Defect as alleged herein.

164. VWGoA was afforded a reasonable opportunity to cure its breach, including when Plaintiff brought his vehicle to authorized VWGoA dealerships for diagnosis and repair of their subframes.

165. Plaintiff was not required to provide any additional notice to VWGoA beyond the notice described herein, or any additional notice was excused because VWGoA already knew of the Defect and because affording VWGoA further opportunity to cure would have been futile. VWGoA was on notice of the Defect from complaints and service requests received from Plaintiff and Class Members, warranty claims, goodwill claims, dealer repair orders, replacement of subframes, replacement-part demand, and other internal sources.

166. Plaintiff was not required to notify VWGoA of the breach or were not required to do so because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VW was also on notice of the defect from complaints and service requests they received from Class Members,

from repairs and/or replacements of corroded subframes, and from other internal sources.

167. Plaintiff Behm provided notice to VWGoA of his and other Class Members breach-of-warranty claims under the MMWA by letter dated December 19, 2025.

168. As a direct and proximate cause of VWGoA's breach, Plaintiff suffered, and continues to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiff has incurred or will incur economic damages at the point of repair in the form of the cost of repair.

169. Plaintiff is entitled to legal and equitable relief against VWGoA, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

**<u>COUNT II</u>**
**BREACH OF IMPLIED WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2303 *et seq.*)**
**(On Behalf of the Plaintiff in His Individual Capacity Against VWGoA)**

170. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

171. Plaintiff brings this count on behalf of himself in his individual capacity against VWGoA.

172. Under applicable state law, VWGoA impliedly warranted that Plaintiff's Class Vehicle was of merchantable quality and fit for its ordinary and intended purpose. These implied warranties included, among other things: (i) a

63

warranty that the Class Vehicles and their subframe would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles would be fit for their ordinary purpose while the Class Vehicles were being operated under normal and foreseeable conditions.

173. Contrary to the applicable implied warranties, Plaintiffs' Class Vehicles were not fit for their ordinary and intended purpose of providing reliable, durable, and safe transportation. At the time of sale and thereafter, the Class Vehicles contained the Subframe Defect, which caused or can cause rust and corrosion, loss of use, expensive repairs, loss of motive power or drivability issues, and subframe damage.

174. VWGoA's breach of implied warranties has deprived Plaintiff of the benefit of his bargain.

175. The amount in controversy satisfies the jurisdictional requirements of the Magnuson-Moss Warranty Act. The amount in controversy of Plaintiff's individual claim exceeds $25, and the aggregate amount in controversy exceeds $50,000, exclusive of interests and costs.

176. VWGoA was afforded a reasonable opportunity to cure its breach, including when Plaintiff sought warranty coverage and repair of corrosion, rust, subframe component failures, and related symptoms from a VWGoA dealerships, as well as after paying out of pocket to replace the subframe and seeking reimbursement from a VWGoA dealership, as well as Audi of America.

177. Plaintiff was not required to provide any additional notice to VWGoA, or any additional notice was excused because VWGoA already knew of the Defect

64

and because affording VWGoA further opportunity to cure would have been futile. VWGoA was on notice of the Defect from complaints and service requests received from Plaintiff and Class Members, warranty claims, goodwill claims, dealer repair orders, replacement of subframe components, replacement-part demand, technical service materials, and other internal sources.

178. Plaintiff Behm provided notice to VWGoA of his and other Class Members breach-of-warranty claims under the MMWA by letter dated December 19, 2025.

179. Because VWGoA breached implied warranties arising under applicable state law, VWGoA also violated the Magnuson-Moss Warranty Act. As a result of VWGoA's violations of the Magnuson-Moss Warranty Act, Plaintiff has incurred damages.

## COUNT III
### UNJUST ENRICHMENT
**(On Behalf of the Class, or in the Alternative, on Behalf of the Sub-Classes Against All Defendants)**

180. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

181. Plaintiff brings this count on behalf of himself and the Class, or in the alternative, on behalf of the Maryland and Virginia Sub-Classes.

182. As a direct and proximate result of VW's failure to disclose the Subframe Defect, VW has profited through the sale, lease, distribution, warranty administration, service, repair, and supply of replacement parts for the Class Vehicles. Although many Class Vehicles were purchased or leased through

65

VWGoA's authorized dealerships, money and benefits from the sale, lease, warranty, service, repair, and parts ecosystem for the Class Vehicles flowed directly or indirectly to VW.

183. Additionally, as a direct and proximate result of VW's failure to disclose the Defect, Plaintiff and Class Members purchased or leased vehicles worth less than represented, overpaid for their vehicles, paid for diagnosis, repair, replacement parts, warranty or service coverage, and related expenses, and/or suffered diminished value. These payments and benefits conferred an unjust substantial benefit upon VW.

184. VW has been unjustly enriched because it retained money and benefits obtained from Plaintiff and Class Members through its omissions and concealment of the Defect, when such money and benefits should have remained with Plaintiff and Class Members or should have been used to disclose, diagnose, repair, reimburse, or otherwise remedy the Defect.

185. As a result of VW's unjust enrichment, Plaintiff and Class Members have suffered damages and economic loss

186. Plaintiff and Class Members seek restitution, disgorgement, and/or other equitable relief requiring VW to restore the money and benefits it unjustly retained as a result of its failure to disclose the Defect, to the extent such relief is permitted by applicable law.

187. Additionally, Plaintiff seeks appropriate injunctive and equitable relief requiring VW, to the extent permitted by applicable law, to provide notice of the Defect, offer effective remediation or repair solutions, provide replacement

components that do not contain the Defect, reimburse Class Members for unreimbursed costs incurred to diagnose and repair the Defect and related damage, and/or reform applicable warranty coverage in a manner deemed appropriate by the Court. Money damages are not an adequate remedy for the above-requested non-monetary equitable relief.

## COUNT IV
## FOR FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT
### (On Behalf of the Class, or in the Alternative, on Behalf of the Sub-Classes Against All Defendants)

188. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

189. Plaintiff brings this count on behalf of themselves and the Class, or in the alternative, on behalf of the Maryland and Virginia Sub-Classes.

190. VW knew that the Class Vehicles contained the Subframe Defect, were defective in design, materials, manufacture, workmanship, and/or assembly, and were not as safe, reliable, durable, or fit for ordinary use as VW represented and as reasonable consumers expected.

191. VW concealed from and failed to disclose to Plaintiff and Class Members the defective nature of the Class Vehicles. Specifically, VW failed to disclose that the Class Vehicles' subframe was prone to premature severe rust and corrosion of the subframe itself and other component parts essential to the suspension and drivetrain, resulting in loss of use, expensive repairs, and exposure to safety risks such as loss of vehicle control and increased impacts in collisions.

192. VW was under a duty to Plaintiff and Class Members to disclose the defective nature of the Class Vehicles because:

     a.    VW was in a superior position to know the true facts concerning the Defect, including through pre-release testing, warranty claims, dealer repair orders, technical assistance requests, replacement-part demand, customer complaints, NHTSA complaints, and dealer-facing technical service materials;

     b.    The omitted facts were material because they directly affected the safety, reliability, durability, value, repair cost, and ordinary use of the Class Vehicles, and because the Defect manifests within the express warranty period;

     c.    VW knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiff and Class Members before purchase or lease;

     d.    VW made partial disclosures and representations concerning the quality, reliability, safety, performance, refinement, durability, warranty coverage, and ordinary usefulness of the Class Vehicles without disclosing the Defect; and

     e.    VW actively concealed the defective nature of the Class Vehicles by addressing recurring subframe rust and corrosion conditions through dealer-facing technical materials, warranty processes, piecemeal repairs, and service communications rather than through consumer-facing disclosure.

193. The facts concealed or not disclosed by VW were material. A reasonable person would have considered them important in deciding whether to purchase or lease a Class Vehicle, how much to pay for a Class Vehicle, whether to purchase warranty or service coverage, whether to present the vehicle for repair, and whether to continue operating the vehicle after visible rust or corrosion appeared near the subframe coverings. Had Plaintiff and Class Members known about the Defect, they would not have purchased or leased the Class Vehicles, would have paid less for them, would have purchased or leased different vehicles, would have purchased additional warranty or service coverage, and/or would have required that the defective subframe components be replaced with non-defective components before purchase, lease, or expiration of applicable warranty coverage.

194. VW concealed or failed to disclose the true nature of the Defect in order to induce Plaintiff and Class Members to purchase or lease the Class Vehicles, pay more for them than they otherwise would have paid, continue using authorized VW dealerships and VW-supplied replacement parts for repairs, and refrain from seeking remedies earlier. Plaintiff and Class Members justifiably relied on VW's omissions to their detriment. This detriment is evident from Plaintiff's and Class Members' purchase or lease of defective Class Vehicles, overpayment for those vehicles, diminished vehicle value, loss of use, and costs incurred to diagnose, repair, or replace defective subframe components and related damage.

195. VW had multiple opportunities to disclose the Defect, including through brochures, websites, advertisements, press materials, Monroney stickers, warranty booklets, owner's manuals, certified pre-owned materials, authorized-

69

dealer communications, technical service materials made available to consumers, warranty communications, and customer-assistance communications. VW did not disclose the Defect through those channels before Plaintiff and Class Members purchased or leased their vehicles.

196. VW continued to conceal the defective nature of the Class Vehicles even after early reports of report corrosion and resultant subframe failures. Instead of disclosing the Defect, VW and its authorized dealerships refused to issue any recall or other fix, allowing Class Vehicles to develop severe corrosion underneath the subframe plastic covers, performed piecemeal repairs, and then denied or limited coverage when the extent of the corrosion was revealed.

197. As a direct and proximate result of VW's misconduct, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Plaintiff and the Class reserve their right to elect either to rescind their purchase or lease of the defective Class Vehicles and obtain restitution, or to affirm their purchase or lease of the defective Class Vehicles and recover damages, including overpayment, diminished value, loss of use, repair costs, consequential damages, and other relief permitted by law.

198. VWs acts were done knowingly, intentionally, maliciously, oppressively, deliberately, with intent to defraud, and/or in reckless disregard of Plaintiff's and Class Members' rights and safety, and were undertaken to enrich VW. VW's conduct warrants an assessment of punitive damages in an amount sufficient to punish and deter such conduct in the future, which amount is to be determined according to proof.

70

## COUNT V
**VIOLATIONS OF THE CONSUMER PROTECTION ACTS OF 50 STATES**
**(by Plaintiff on Behalf of the Class, or in the Alternative, on Behalf of the Sub-**
**Classes Against All Defendants)**

199. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

200. Plaintiff brings these statutory consumer protection claims pursuant to consumer protection laws of the states of residence of Class Members identified below to the extent they are not in true conflict with the law of Maryland and Virginia.

201. The following consumer protection acts are collectively referred to herein as the "Consumer Protection Acts," all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices.

   a.   ALA. CODE § 8-19-1 *et seq.* (Alabama);

   b.   ALASKA STAT. ANN. § 45.50.471 *et seq.* (Alaska);

   c.   ARIZ. REV. STAT. ANN. § 44-1521 *et seq.* (Arizona);

   d.   ARK. CODE ANN. § 4-88-101 *et seq.* (Arkansas);

   e.   CAL. CIV. CODE §1750 et seq. (California);

   f.   COLO. REV. STAT. ANN. § 6-1-101 *et seq.* (Colorado);

   g.   CONN. GEN. STAT. ANN. § 42-110a *et seq.* (Connecticut);

   h.   DEL. CODE ANN. tit. 6, § 2511 *et seq.* (Delaware);

   i.   D.C. CODE ANN. § 28-3901 *et seq.* (District of Columbia);

   j.   FLA. STAT. ANN. § 501.201 *et seq.* (Florida);

   k.   GA. CODE ANN. § 10-1-370 *et seq.* and GA. CODE ANN. § 10-1-

390 et seq. (Georgia);

l.     HAW. REV. STAT. ANN. § 480-1 *et seq*. and HAW. REV. STAT. ANN. § 481A-1 *et seq*. (Hawaii);

m.     IDAHO CODE ANN. § 48-601 *et seq*. (Idaho);

n.     815 ILCS 505/1 *et seq*. (Illinois);

o.     IND. CODE ANN. § 24-5-0.5-1 *et seq*. (Indiana);

p.     IOWA CODE 714H.1, *et seq*. (Iowa);

q.     KAN. STAT. ANN. § 50-623 *et seq*. (Kansas);

r.     KY. REV. STAT. ANN. § 367.110 *et seq*. (Kentucky);

s.     LA. STAT. ANN. § 51:1401 *et seq*. (Louisiana);

t.     MASS. GEN. LAWS, Ch. 93A (Massachusetts)

u.     ME. REV. STAT. tit. 5, § 205-A *et seq*. (Maine);

v.     MD. CODE ANN., COM. LAW § 13-101 *et seq*. (Maryland);

w.     MICH. COMP. LAWS ANN. § 445.901 *et seq*. (Michigan);

x.     MINN. STAT. ANN. § 325F.68 *et seq*., MINN. STAT. ANN. § 325D.09 *et seq*., MINN. STAT. ANN. § 325D.43 *et seq*., and MINN. STAT. ANN. § 325F.67 (Minnesota);

y.     MISS. CODE ANN. § 75-24-1 *et seq*. (Mississippi);

z.     MO. ANN. STAT. § 407.010 *et seq*. (Missouri);

aa.     MONT. CODE ANN. § 30-14-101 *et seq*. (Montana);

bb.     NEB. REV. STAT. ANN. § 59-1601 *et seq*. (Nebraska);

cc.     NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN. §598.0903 *et seq*. (Nevada);

72

dd.    N.H. REV. STAT. ANN. § 358-A:1 *et seq*. (New Hampshire);

ee.    N.J. STAT. ANN. § 56:8-1 *et seq*. (New Jersey);

ff.    N.M. STAT. ANN. § 57-12-1 *et seq*. (New Mexico);

gg.    N.Y. GEN. BUS. LAW. § 349 *et seq*. (New York);

hh.    N.C. GEN. STAT. ANN. § 75-1 *et seq*. (North Carolina);

ii.    N.D. CENT. CODE ANN. § 51-15-01 *et seq*. (North Dakota);

jj.    OHIO REV. CODE ANN. § 1345.01 *et seq*. (Ohio);

kk.    OKLA. STAT. ANN. tit. 15, § 751 *et seq*. (Oklahoma);

ll.    OR. REV. STAT. ANN. § 646.605 *et seq*. (Oregon);

mm.    73 PA. STAT. ANN. § 201-1 *et seq*. (Pennsylvania);

nn.    R.I. GEN. LAWS ANN. § 6-13.1-1 *et seq*. (Rhode Island);

oo.    S.C. CODE ANN. § 39-5-10 *et seq*. (South Carolina);

pp.    S.D. CODIFIED LAWS § 37-24-1 *et seq*. (South Dakota);

qq.    TENN. CODE ANN. § 47-18-101 *et seq*. (Tennessee);

rr.    TEX BUS. & COM. CODE § 17.41, *et seq*. (Texas);

ss.    UTAH CODE ANN. § 13-11-1 *et seq*. (Utah);

tt.    VT. STAT. ANN. tit. 9, § 2451 *et seq*. (Vermont);

uu.    VA. CODE ANN. § 59.1-196 *et seq*. (Virginia);

vv.    WASH. REV. CODE ANN. § 19.86.010 *et seq*. (Washington);

ww.    W.VA. CODE ANN. § 46A-6-101 *et seq*. (West Virginia);

xx.    WIS. STAT. ANN. § 100.20 (Wisconsin); and

yy.    WYO. STAT. ANN. § 40-12-101 *et seq*. (Wyoming)

202. VW has engaged in deception, fraud, unfair practices, and concealment by its conduct and omissions described herein, including by knowingly and intentionally concealing from Plaintiff and all Class Members the existence and nature of the Subframe Defect (and the required repair costs, safety hazards, and diminished value of the Class Vehicles as a result of Defendants' conduct), while representing in its marketing, advertising, and other broadly disseminated representations that the Class Vehicles were safe when, in fact, the Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. VW's representations, omissions, and active concealments about the Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

203. VW's unfair or deceptive acts or practices occurred repeatedly in the course of VW's trade or business and were likely to mislead a substantial portion of the purchasing public.

204. Plaintiff Behm and Maryland Sub-Class Members relied on VW's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had they known the truth..

205. As a direct and proximate result of VW's unfair, unlawful, and deceptive practices, Plaintiff Behm and Class Members have lost money., and they are entitled to relief under the above-identified Consumer Protection Acts.

206. Plaintiff Behm provided notice of his claims and those of other Class Members by letter dated December 19, 2025.

74

207. VW's conduct in this regard was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff and other Class Members and, as such, warrants the imposition of punitive damages.

**Claims on behalf of the Maryland Sub-Class**
**COUNT VI**
**VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT**
**(MD. CODE ANN. COM. LAW § 13-101, *et seq*.)**
**(On Behalf of the Maryland Sub-Class Against All Defendants)**

208. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

209. Plaintiff Mitchell Behm ("Maryland Plaintiff") brings this count on behalf of himself and the Class, or in the alternative, on behalf of the Maryland Sub-Class.

210. The members of the Class and Defendants are "persons" within the meaning of Md. Code Ann. Com. Laws 6 § 13-10(b).

211. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair and deceptive trade practice in the sale or lease of any consumer good, including representing that goods are of a particular standard, quality, or grade if they are not, advertising goods without intent to sell or lease them as advertised, selling goods knowing that a service, replacement or repair was needed, "failure to state a material fact if the failure deceives or tends to deceive," and "[d]eception, fraud, false pretense, false premise, misrepresentation,

or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code Ann., Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code Ann., Com. Law § 13-302. VW engaged in unfair and deceptive practices that violated the Maryland CPA as described above.

212.   VW committed an unlawful business act or practice in violation of Md. Code Ann. Com. Law § 130101, et seq., by systematically breaching its warranty obligations and by violating the Maryland CPA as alleged below.

213.   VW committed unfair business acts and practices in violation of the Maryland CPA because the acts and practices described herein, including but not limited to VW's failure to provide a permanent remedy to fix the Defect, were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff Behm and Maryland Sub-Class Members. VW's acts and practices were additionally unfair because the harm to Plaintiff and Maryland Sub-Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, VW's acts and practices were unfair in that they were contrary to legislatively declared or public policy.

214.   VW committed fraudulent business acts and practices in violation of the Maryland CPA when it concealed the existence and nature of the Defect, while representing in its marketing, advertising, and other broadly disseminated

representations that the Class Vehicles were safe when, in fact, the Defect creates a significant and material safety hazard and inhibits the quality and functionality of the Class Vehicles. VW's representations, omissions, and active concealments about the Defect are likely to mislead the public with regard to the true defective nature of Class Vehicles.

215.  VW's unfair or deceptive acts or practices occurred repeatedly in the course of VW's trade or business and were likely to mislead a substantial portion of the purchasing public.

216.  Plaintiff Behm and Maryland Sub-Class Members relied on VW's material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had they known the truth.

217.  As a direct and proximate result of VW's unfair, unlawful, and deceptive practices, Plaintiff Behm and Maryland Sub-Class Members have lost money.

218.  Plaintiff Behm would consider purchasing or leasing similar VW vehicles in the future if he could rely on VW's representations regarding the vehicles.

219.  Plaintiff Behm provided notice of his claims and those of other Class Members by letter dated December 19, 2025.

220. Pursuant to Md. Code Ann., Com. Law § 13-408, Plaintiff Behm and Maryland Sub-Class Members seek an order enjoining VW from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to the Maryland CPA.

**COUNT VII**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(MD. COM. LAW §§ 2-314 and 2A-212)**
**(On Behalf of the Maryland Sub-Class Against VWGoA)**

221. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

222. Plaintiff Behm brings this count on behalf of himself and the Maryland Sub-Class against Defendant.

223. VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

224. With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

225. The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

226. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Md. Com. Law §§ 2-314 and 2A-212.

78

227.   A warranty that the Class Vehicles and/or the defective subframes installed in them were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

228.   In addition, a warranty that the Class Vehicles and/or the defective subframes installed in them were fit for their particular purpose is implied by law pursuant to Md. Com. Law §§ 2-314 and 2A-212.

229.   VWGoA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VWGoA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiff Behm and members of the Maryland Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VWGoA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Maryland Plaintiff and members of the Maryland Sub-Class, with no modification to the defective Class Vehicles.

230.   VWGoA provided Maryland Plaintiff and members of the Maryland Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and

79

their subframes suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

231. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by VWGoA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

232. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Maryland Plaintiff and Maryland Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. VWGoA knew of this defect at the time these sale or lease transactions occurred.

233. As a result of VWGoA's breach of the applicable implied warranties, Maryland Plaintiff and members of the Maryland Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Subframe Defect, Maryland Plaintiff and members of the Maryland Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

80

234. VWGoA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

235. Maryland Plaintiff and members of the Maryland Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VWGoA's conduct described herein.

236. Privity is not required here because Maryland Plaintiff and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between VWGoA and its distributors and dealers, and specifically, of VWGoA's express warranties, including the NVLW, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

237. Maryland Plaintiff and members of the Maryland Sub-Class were not required to notify VWGoA of the breach because affording VWGoA a reasonable opportunity to cure its breach of warranty would have been futile. VWGoA was also on notice of the Subframe Defect from the complaints and service requests it

81

received from Maryland Plaintiff and the Maryland Sub-Class Members and through other internal sources.

238.   Nonetheless, Maryland Plaintiff and members of the Maryland Sub-Class provided notice to VWGoA of the breach of express warranties when they took their vehicles to VWGoA-authorized providers of warranty repairs. Maryland Plaintiff also provided notice to VWGoA of its breach of express warranty by letter dated December 19, 2025.

239.   As a direct and proximate cause of VWGoA's breach, Maryland Plaintiff and members of the Maryland Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Maryland Plaintiff and members of the Maryland Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

240.   As a direct and proximate result of VWGoA's breach of the implied warranty of merchantability, Maryland Plaintiff and members of the Marylamd Sub-Class have been damaged in an amount to be proven at trial.

## COUNT VIII
### Breach of Express Warranty
### MD. COM. LAW 6 §§ 2-313 and 2A-210
### (On Behalf of the Maryland Sub-Class against Defendant VWGoA)

241. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

242. Maryland Plaintiff brings this count on behalf of himself and the Maryland Sub-Class against VWGoA.

243. VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Com. Law §§ 2-104(1) and 2A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

244. With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under Md. Com. Law § 2A-103(1)(p).

245. The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Com. Law §§ 2-105(1) and 2A-103(1)(h).

246. The subframe system was manufactured and/or installed in the Class Vehicles by Defendants and is covered by the express warranty.

247. Defendants provided all purchasers and lessees of the Class Vehicles with express warranties described herein, which became a material part of the bargain. Accordingly, VWGoA's express warranty is an express warranty under Maryland state law.

83

248. VWGoA's general New Vehicle Limited Warranty ("NVLW") provides in relevant part that it "covers any repair or replacement to correct a defect in manufacturer's material and workmanship. Your authorized Audi dealer will repair the defective part or replace it with a new or remanufactured Audi Genuine Part free of charge." According to VWGoA, the "The basic warranty period is for four (4) years or until the vehicle has been driven 50,000 miles (80,000 kilometers), whichever occurs first."

249. VWGoA's more specific Limited Warranty Against Corrosion Perforation specifically covers rust perforation of the vehicle body for an extended period of 12 years without any mileage limitation.

250. VWGoA's NVLW, Corrosion Perforation Warranty, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Plaintiff Behm and members of the Maryland Sub-Class purchased or leased the Class Vehicles with the defective subframe components.

251. Plaintiff Behm and members of the Maryland Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, VWGoA failed to inform Plaintiff Behm and members of the Maryland Sub-Class that the Class Vehicles were equipped with defective subframes and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Subframe Defect.

252.    VWGoA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

253.    Privity is not required here because Plaintiff Behm and members of the Maryland Sub-Class are intended third-party beneficiaries of contracts between VWGoA and its distributors and dealers, and specifically, of VWGoA's express warranties, including the NVLW, the Corrosion Perforation Warranty, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

254.    Any attempt by VWGoA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because VWGoA knowingly sold or leased defective products without informing consumers about the Subframe Defect. The time limits are unconscionable and inadequate to protect Plaintiff Behm and the members of the Maryland Sub-Class. Among other things, Plaintiff Behm and members of the Maryland Sub-Class did not determine these time limitations and/or

85

did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by VWGoA and unreasonable favored VWGoA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Subframe Defect existed between VWGoA and members of the Maryland Sub-Class.

255. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiff Behm and the members of the Maryland Sub-Class whole, because VWGoA has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

256. Plaintiff Behm was not required to notify VWGoA of the breach because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the Subframe Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to VWGoA, and through other internal sources.

257. Nonetheless, Plaintiff Behm and members of the Maryland Sub-Class provided notice to VWGoA of the breach of express warranties when they took their vehicles to VWGoA-authorized providers of warranty repairs. Plaintiff Behm also

provided notice to VWGoA of its breach of express warranty by letter dated December 19, 2025.

258. As a result of VWGoA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

259. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff Behm and members of the Maryland Sub-Class have been damaged in an amount to be determined at trial.

260. As a result of VWGoA's breach of the express warranty, Plaintiff Behm and Maryland Sub-Class Members are entitled to legal and equitable relief against VWGoA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**Claims on Behalf of the Virginia Sub-Class**

**COUNT IX**
**Violations of the Virginia Consumer Protection Act**
**VA. CODE ANN. §§ 59.1-196, *et seq.***
**(On Behalf of the Virginia Sub-Class against All Defendants)**

261. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

262. Plaintiff Mitchell Behm ("Virginia Plaintiff") brings this count on behalf of himself and the Virginia Sub-Class against Defendants.

87

263. VW's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florid Virginia Consumer Protection Act, § 59.1-196, et seq., ("Virginia CPA").

264. At all relevant times, Virginia Plaintiff and members of the Virginia Sub-Class were "persons" within the meaning of Va. Code. Ann. § 59.1-198.

265. Defendants are and were at all relevant times "suppliers" of motor vehicles under VA. Code Ann. §59.1-198.

266. The sale of the Class Vehicles is and was at all relevant times a "consumer transaction" within the meaning of VA. Code Ann. § 59.1-198.

267. The Virginia CPA prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction" and lists practices that include:

  a. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses or benefits;

  b.  Misrepresenting that goods or services are of a particular standard, quality, grade, style or model;

  c. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;

d. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

VA. Code. Ann § 59.1-198.

268.    VW participated in unfair or deceptive trade practices that violated the Virginia CPA. As described below and alleged throughout the Complaint, by failing to disclose the Subframe Defect, by concealing the Subframe Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Subframe Defect in the course of its business.

269.    VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

270.    VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

89

271. VW knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

272. VW knew or should have known that its conduct violated the Virginia CPA.

273. VW was under a duty to Plaintiff Behm and the Virginia Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a. VW was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b. VW made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c. VW actively concealed the defective nature of the Class Vehicles from Plaintiff Behm and the Virginia Sub-Class Members at the time of sale and thereafter.

274. By failing to disclose the Subframe Defect, VW knowingly and intentionally concealed material facts and breached its duty not to do so.

275. The facts concealed or not disclosed by VW to Plaintiff Behm and the Virginia Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle's subframes

are defective is a material safety concern. Had Plaintiff Behm and the Virginia Sub-Class Members known that the Class Vehicles suffered from the Subframe Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

276. Virginia Plaintiff and the Virginia Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Subframe Defect. That is the reasonable and objective consumer expectation for vehicles.

277. As a result of Defendants' misconduct, Plaintiff Behm and the Virginia Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

278. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Behm and the Virginia Sub-Class Members have suffered and will continue to suffer actual damages.

279. VW's violations present a continuing risk to Plaintiff Behm and the Virginia Sub-Class Members as well as to the general public. VW's unlawful acts and practices complained of herein affect the public interest.

280. Pursuant to VA. Code Ann. § 59.1-204, Plaintiff Behm and the Virginia Sub-Class Members seek, inter alia, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the Virginia CPA. Because VW acted with willful and conscious disregard of

91

the rights and safety of others, VW's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT X
### Breach of the Implied Warranty of Merchantability
### VA. CODE ANN. §§ 8.2-314, 8.2-315, and 8.2A-212
### (On Behalf of the Virgina Sub-Class against Defendant VWGoA)

281. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

282. Plaintiff Behm brings this count on behalf of himself and the Virginia Sub-Class against VWGoA.

283. VWGoA is and was at all relevant times "sellers" of motor vehicles under VA. Code Ann. §8-2-313(1)-(2), and "merchants" with respect to motor vehicles within the meaning of §§8-2-104(1) and 8.2A-103(1)(t).

284. With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under VA. Code Ann. §8-2A-103(1)(p).

285. Plaintiff and the members of the Class are and were at all relevant times "buyers" with respect to the Class Vehicles under VA. Code Ann. §8-2-313(1).

286. The Class Vehicles are and were at all relevant times "goods" within the meaning of VA. Code Ann. §§ 8-2-105(1) and 8.2A-103(1)(h).

92

287.　A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under VA. Code Ann. §§ 8-2-314 and 8.2A-212.

288.　VWGoA knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VWGoA directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Plaintiff Behm and members of the Virginia Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VWGoA knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff Behm and members of the Virginia Sub-Class, with no modification to the defective Class Vehicles.

289.　VWGoA provided Plaintiff Behm and members of the Virginia Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold, pursuant to VA. Code Ann. §8.2-315. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their subframes suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

93

290.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by VWGoA were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

291.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Behm and Virginia Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. VWGoA knew of this defect at the time these sale or lease transactions occurred.

292.   As a result of VWGoA's breach of the applicable implied warranties, Plaintiff and members of the Virginia Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Subframe Defect, Plaintiff and members of the Virginia Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

293.   VWGoA's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

94

294. Privity is not required here because Plaintiff and members of the Virginia Sub-Class are intended third-party beneficiaries of contracts between VWGoA and its distributors and dealers, and specifically, of VWGoA's express warranties, including the NVLW, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

295. Plaintiff and members of the Virginia Sub-Class were not required to notify VWGoA of the breach because affording VWGoA a reasonable opportunity to cure its breach of warranty would have been futile. VWGoA was also on notice of the Subframe Defect from the complaints and service requests it received from Plaintiff and the Class Members and through other internal sources.

296. Nonetheless, Plaintiff and members of the Virginia Sub-Class provided notice to VWGoA of the breach of express warranties when they contacted and/or took their vehicles to VWGoA-authorized providers of warranty repairs regarding subframe corrosion. Plaintiff also provided notice to VWGoA of its breach of express warranty by letter dated December 19, 2025.

297. As a direct and proximate cause of VWGoA's breach, Plaintiff and members of the Virginia Sub-Class suffered damages and continue to suffer

95

damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff and members of the Virginia Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

298.    As a direct and proximate result of VWGoA's breach of the implied warranty of merchantability, Plaintiff and members of the Virginia Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XI
**Breach of Express Warranty**
**VA. Code Ann. §§ 8-2-313, 8-2A-103 and 8.2A-210**
**(On Behalf of the Virginia Sub-Class against Defendant VWGoA)**

299.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

300.    Plaintiff brings this count on behalf of himself and the Virginia Sub-Class against VWGoA.

301.    VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Va. Code Ann. §§ 8-2-104(1) and 8.2A-103(1)(t), and a "seller" of motor vehicles under § 8-2-313(1)-(2).

302.    With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under VA. Code Ann. § 8-2A-103(1)(p).

96

303. Plaintiff and the Class members are and were at all relevant times "buyers" with respect to the Class Vehicles under VA. Code Ann. §8-2-313(1).

304. The Class Vehicles are and were at all relevant times "goods" within the meaning of VA. Code Ann. §§ 8-2-105(1) and 8.2A-103(1)(h).

305. The subframe system was manufactured and/or installed in the Class Vehicles by VWGoA and is covered by the express warranty.

306. VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, VWGoA's express warranty is an express warranty under Virginia state law.

307. VWGoA's general New Vehicle Limited Warranty ("NVLW") provides in relevant part that it "covers any repair or replacement to correct a defect in manufacturer's material and workmanship. Your authorized Audi dealer will repair the defective part or replace it with a new or remanufactured Audi Genuine Part free of charge." According to VWGoA, the "The basic warranty period is for four (4) years or until the vehicle has been driven 50,000 miles (80,000 kilometers), whichever occurs first."

308. VWGoA's more specific Limited Warranty Against Corrosion Perforation specifically covers rust perforation of the vehicle body for an extended period of 12 years without any mileage limitation

309. VWGoA's NVLW, Corrosion Perforation Warranty, and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Plaintiff and members of the Virginia Sub-Class purchased or leased the Class Vehicles with the defective subframe components.

310. Plaintiff and members of the Virginia Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiff and members of the Virginia Sub-Class that the Class Vehicles were equipped with defective subframes. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Subframe Defect.

311. VWGoA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

312. Privity is not required here because Plaintiff and members of the Virginia Sub-Class are intended third-party beneficiaries of contracts between VWGoA and its distributors and dealers, and specifically, of VWGoA's express warranties, including the NVLW, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the

Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

313. Any attempt by VWGoA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because VW knowingly sold or leased defective products without informing consumers about the Subframe Defect. The time limits are unconscionable and inadequate to protect Plaintiff and the members of the Virginia Sub-Class. Among other things, Plaintiff and members of the Virginia Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by VWGoA and unreasonably favored VWGoA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Subframe Defect existed between VWGoA and members of the Virginia Sub-Class.

314. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the members of the Virginia Sub-Class whole, because VWGoA has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

315. Virginia Plaintiff was not required to notify VWGoA of the breach because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the Subframe Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

316. Nonetheless, Plaintiff and members of the Virginia Sub-Class provided notice to VWGoA of the breach of express warranties when they took their vehicles to or contacted VWGoA-authorized providers of warranty repairs regarding subframe corrosion. Virginia Plaintiff also provided notice to VWGoA of its breach of express warranty by letter dated December 19, 2025.

317. As a result of VWGoA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

318. As a direct and proximate result of Defendants' breach of express warranties, Plaintiff and members of the Virginia Sub-Class have been damaged in an amount to be determined at trial.

319. As a result of VWGoA's breach of the express warranty, Plaintiff and Virginia Sub-Class Members are entitled to legal and equitable relief against

VWGoA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XI
## FOR DECLARATORY AND INJUNCTIVE RELIEF

320. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

321. As illustrated in the foregoing allegations, there is an actual controversy between VW and Plaintiff concerning: (1) whether the subframe and related components found in Class Vehicles are defectively designed and manufactured; (2) whether VW knew, or should have known, of that Defect; (3) whether VW knew, or should have known, that the Defect would impact the safety and performance of the Class Vehicles.

322. Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought," provided that the declaratory relief requested does not fall within any of the exemptions set forth in the Act.

323. Plaintiff asks this Court for an order enjoining VW from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling VW to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling VW to repair and eliminate the Subframe Defect from every Class Vehicle; enjoining VW from selling the Class Vehicles with the misleading information; and/or compelling VW to reform its warranty, in a manner

deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests that this Court enter judgment against Defendants and in favor of Plaintiff, the Class and all Sub-Classes, and award the following relief:

A. A declaration that any applicable statutes of limitations are tolled due to Defendants' fraudulent concealment and that Defendants are estopped from relying on any statutes of limitations in defense;

B. A declaration that Defendants are financially responsible for notifying all Class Members of the Subframe Defect;

C. An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to repair and eliminate the Subframe Defect from every Class Vehicle; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling Defendants to reform their warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

D. Damages and restitution in an amount to be proven at trial;

E. An order certifying the proposed Class and Sub-Classes, designating

102

Plaintiff a named representative of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

F.   Any and all remedies provided pursuant to the express and implied warranty laws, common law fraud by concealment laws, and consumer protection statutes alleged herein;

G.   An award to Plaintiff and the Class and Sub-Classes of compensatory, exemplary, and statutory damages as applicable, including interest, in an amount to be proven at trial;

H.   A declaration that Defendants must disgorge, for the benefit of the Class and Sub-Classes, all or part of the ill-gotten profits it received from the sale or lease of Class Vehicles, and/or make full restitution to Plaintiff and Class Members;

I.   An award of reasonable attorneys' fees and costs, as allowed by law;

J.   An award of pre-judgment and post-judgment interest, as provided by law;

K.   Leave to amend the Complaint to conform to the evidence produced at trial; and

L.   Such other relief as may be appropriate under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury of any and all issues in this action so triable.

Dated: May 22, 2026

BERGER MONTAGUE PC

*/s/ Russell D. Paul*

Russell D. Paul (NJ Bar No. 037411989)
Amey J. Park (NJ Bar No. 070422014)
Natalie Lesser (NJ Bar No. 017882010)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:  (215) 875-3000
Fax:  (215) 875-4604
rpaul@bergermontague.com
apark@bergermontague.com
nlesser@bergermontague.com

Anna C. Haac (*pro hac vice* forthcoming)
**HAAC LAW, LLC**
11810 Grand Park Ave.,
Suite 500
North Bethesda, MD 20852
Tel: (240) 389-0199
Fax: (701) 829-3249
anna@haaclaw.com

***Attorneys for Plaintiff and the Proposed Classes***

104